**SUPERIOR LIFE INSURANCE COM-
PANY, Appellee,**

v.

**UNITED STATES of America,
Appellant.**

**SUPERIOR LIFE INSURANCE COM-
PANY, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

Nos. 71–1777, 71–1778.

United States Court of Appeals,
Fourth Circuit.

Argued March 8, 1972.

Decided June 7, 1972.

946

Thomas L. Stapleton, Atty., Dept. of Justice (Fred B. Ugast, Acting Asst. Atty. Gen., Meyer Rothwacks, and John A. Townsend, Attys., Tax Div., Dept. of Justice, and John K. Grisso, U. S. Atty., on brief), for United States.

George C. Evans and Charles F. Ailstock, Charleston, S. C. (Sinkler, Gibbs, Simons & Guerard, Charleston, S. C., on brief), for Superior Life Ins. Co.

Before BRYAN, CRAVEN and BUTZNER, Circuit Judges.

CRAVEN, Circuit Judge:

Claiming that it qualified as a life insurance company under Section 801 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 801, Superior Life Insurance Company sought a refund of federal income taxes in the amount of $126,645.80 in the United States District Court for the District of South Carolina. From the judgment granting a full refund, 322 F.Supp. 921, the Government appeals. We find that the appeal is timely, and reaching the merits, we reverse.

I.   TIMELINESS OF THE APPEAL

Taxpayer contends that this court lacks jurisdiction over the present case because the Government did not file a timely notice of appeal. Rule 4(a), Federal Rules of Appellate Procedure, requires the Government to file notice of appeal within 60 days of the entry of judgment. The Government initiated this appeal on July 14, 1971. In dispute is the date of the judgment.

The district court filed its 34-page Memorandum of Decision on February 10, 1971. Taxpayer contends the last page constituted a final judgment. Attached to the usual findings of fact and conclusions of law, page 34 [322 F.Supp. page 939] read as follows:

ORDER FOR JUDGMENT

On the basis of the foregoing Findings of Fact and Conclusions of Law, it is, therefore,

Adjudged and Decreed that the plaintiff, Superior Life Insurance Company, have recovery and judgment against the defendant, United States of America, in the amount of its Claims for Refund of Federal Income Taxes for each of the taxable years in question, together with interest paid thereon to the date of payment, and statutory interest of six percent (6%) per cannum [sic] on such amounts from the date of payment, as was prayed for by the plaintiff in its Complaint.

AND IT IS SO ORDERED.

Columbia, South Carolina

February 9, 1971

/s/ Robert W. Hemphill
ROBERT W. HEMPHILL
United States District Judge

On February 16, 1971, Mr. Wistar D. Stuckey, Assistant United States Attorney for South Carolina, sent to Mr. Hubert Doster, the Justice Department attorney with whom he had handled the Government's case, and to Mr. George C. Evans, co-counsel for taxpayer, a letter reading in pertinent part as follows:

Enclosed is a copy of an Order filed February 10, 1971 in connection with the above entitled case. The Court has suggested that we submit a proposed

judgment correct as to form based on the Order. By copy of this letter, I am suggesting that Mr. Evans prepare one and send it to me and I will in turn forward it on to you for your consent or suggestions and when both you and Mr. Evans have agreed upon a proposed judgment correct as to form it can be then forwarded to me and I will submit it to Judge Hemphill.

Mr. Evans prepared a judgment and mailed it to Mr. Stuckey on February 22, 1971. This proposed judgment was forwarded by Mr. Stuckey to Mr. Doster on February 26, 1971. Although Mr. Doster did not receive the proposed judgment, he did request the Internal Revenue Service to verify the amount due. Sometime during the week of April 4 through 10, 1971, Mr. Evans inquired of Mr. Stuckey about the status of the proposed judgment. Mr. Stuckey thereupon telephoned Mr. Doster, who informed Mr. Stuckey that the amount stated in Mr. Evans' proposed judgment was correct and that, with one minor change, the proposed judgment could be submitted to the district judge as correct in form. Mr. Stuckey relayed this information to Mr. Evans. At this time, Mr. Evans informed Mr. Stuckey that it was then taxpayer's position that the order docketed February 10 was the judgment in the case and, therefore, that a separate judgment was unnecessary. Shortly thereafter, on April 15, 1971, Mr. Stuckey forwarded to the district judge a proposed judgment certified by the Government as being correct. On April 16, 1971, taxpayer filed a motion in the district court requesting an order requiring the Government to comply with the judgment which taxpayer contended had been entered on February 10, and not appealed within 60 days therefrom (by April 12, 1971). On May 17, 1971, the district court denied taxpayer the relief sought in its motion, believing that "the question of whether an appeal from its order may now be maintained . . . is for the appellate court." In this order the district court described the preceding events as follows:

> The court understands that usual procedure for entry of a formal judgment by the Clerk after publication of the order for judgment in tax cases is that the Justice Department verifies the amount of the award, prepares the formal judgment, and sends it to the Clerk for entry. The Clerk and the parties understood that that was to be done in this case. There was no question as to the amount of the judgment in this case. The amount had been stipulated by the parties prior to trial. Yet the defendant did not provide the formal judgment as it had agreed. In fact it did nothing until plaintiff tried to collect the amount of the award after the government's 60 days for appeal had run.

Also on May 17 a nunc pro tunc judgment dated February 10, 1971, was entered. The Government argues that May 17 is the date of the entry of judgment.

We conclude that the order entered on February 10 was not the judgment in this case because it was not "intended by the judge to be his final act." United States v. F. & M. Schaefer Brewing Co., 356 U.S. 227, 234, 78 S.Ct. 674, 678, 2 L.Ed.2d 721 (1958). Upon rendering the May 17 judgment, tne district judge himself stated, "[t]his court will . . . enter this day a formal judgment bearing the date of its prior order, it having been anticipated and presumed by both the court and the plaintiff that such judgment had been entered." Furthermore, the conduct of the parties subsequent to the February 9 decision indicates that it was their clear understanding also that the district judge expected a separate formal judgment to be entered. Finally, the form of the order itself indicates that it was not intended by the district judge to be his final act. The order was not "set forth on a separate document" as required by Rule 58 but was instead simply the 34th page [322 F.Supp. page 939] of a complete

Memorandum of Decision. The language, "[o]n the basis of the foregoing Findings of Fact and Conclusions of Law," obviously refers to the rest of the Memorandum of Decision of which it was a part. The order was included in the numbering of the pages of the opinion, being page 34, the last page and was physically attached to the preceding 33 pages. Also, the order was entitled "order for judgment," not "judgment." Finally, the order did not specify the exact amount of the recovery, or indeed, any amount.

The final act of adjudication in this case occurred on May 17, 1971, and the judgment, "set forth on a separate document," was properly entered on that date. The 60-day period for appeal must be measured from May 17, 1971, and consequently, the Government's appeal was timely.

## II. QUALIFICATION UNDER SECTION 801

### (A) Factual Background

Taxpayer, a South Carolina corporation, is a wholly owned subsidiary of Stephenson Finance Company, a South Carolina small loan company. During the years in question, taxpayer engaged in the business of selling credit life and credit health and accident insurance, primarily to the debtors of Stephenson and finance companies related to Stephenson.

Taxpayer sold its credit insurance to Stephenson's debtors through Stephenson by means of a Group Policy. The Group Policy authorized Stephenson to sell credit insurance to borrowers and to issue to each insured-borrower a certificate of insurance from taxpayer bearing the signature of taxpayer's president. The insurance sold was ordinarily in the face amount of and for the duration of the debtor's indebtedness, and the beneficiary was Stephenson. The insurance contained both life and accident and health features. The amount payable on the death of an insured-borrower was an amount at least sufficient to discharge his indebtedness. The amount payable in the event of total or permanent disability was at least sufficient to meet the installment payments as they became due during the period of the disability. Any benefit in excess of the credit obligation was to be paid directly to the insured-borrower or his estate. Once insurance was issued for a given debtor, it could be terminated in only limited circumstances. According to the Group Policy,

> The insurance on the life of any insured Debtor shall terminate if the indebtedness is discharged, or if the indebtedness in [sic] transferred to another Creditor, or if the indebtedness becomes in default and any other person succeeds debtor under and by transfer of equity.

An insured-borrower paid at the outset the full premium for the life and health and accident coverage. This was accomplished by increasing the face amount of the loan by the amount necessary to pay the full premium. Stephenson then withheld the premium and paid over to the debtor the amount he originally wanted to borrow. On the first day of the month immediately following the month in which the certificate of insurance was issued, Stephenson paid to taxpayer the full premium for the life insurance coverage and one month's premium for the accident and health coverage. Thereafter, on the first day of each month during the entire remainder of the term, Stephenson paid to taxpayer one month's premium for the accident and health coverage. This premium payment schedule between Stephenson and taxpayer was set out in the Group Policy.

In computing life insurance reserves, taxpayer reflected the full portion of the premium paid by an insured-borrower of Stephenson allocable to the life insurance feature. In computing health and accident reserves, taxpayer reflected only a fractional part of this premium allocable to the accident and health feature, i. e., one month's premium. The remainder of the unearned premium paid by the insured-borrower was shown by Stephen-

son in a liability account called "Reserve for Unearned A & H Premiums." [1]

(B) Qualification Under Section 801

The parties agree that the taxpayer is entitled to taxation as a life insurance company for the period under consideration if it met the requirements of the following portions of Section 801, 26 U.S.C.A.:

§ 801. Definition of life insurance company

(a) Life insurance company defined.—For purposes of this subtitle, the term "life insurance company" means an insurance company which · is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

(1) its life insurance reserves (as defined in subsection (b)), plus

(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves,

comprise more than 50 percent of its total reserves (as defined in subsection (c)).

(b) Life insurance reserves defined.—

(1) In general.—For purposes of this part, the term "life insurance reserves" means amounts—

(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

. . . . . .

(c) Total reserves defined.—For purposes of subsection (a), the term "total reserves" means—

(1) life insurance reserves,

(2) unearned premiums, and unpaid losses (whether or not ascertained), not included in life insurance reserves, and

(3) all other insurance reserves required by law.

Whether taxpayer met these requirements depends in turn upon whether and how the unearned premium reserve set up on the books of Stephenson for the accident and health insurance should be included in taxpayer's qualifying fraction.

The district court held that taxpayer qualified as a life insurance company on three alternative grounds: (1) the health and accident unearned premium reserve on Stephenson's books is not required to be included in taxpayer's total reserves, and thus taxpayer's life insur-

---

1. For the years in question, taxpayer's insurance reserves on all policies of insurance issued by it, and the liability account maintained by Stephenson were as follows:

### Superior Life Insurance Company

| Year | Life [Insurance] Reserves (Morbidity) | Accident & Health [Reserves] (Unearned Premiums) |
|------|------|------|
| 1960 | 93,546.67 | 61,667.24 |
| 1961 | 105,417.26 | 68,478.16 |
| 1962 | 159,774.98 | 115,815.69 |
| 1963 | 223,149.38 | 126,468.61 |
| 1964 | 300,668.31 | 184,761.56 |

### Stephenson Finance Company

| Year | "Reserve for Unearned A & H Premiums" |
|------|------|
| 1960 | 93,864.29 |
| 1961 | 87,538.58 |
| 1962 | 91,296.34 |
| 1963 | 121,390.82 |
| 1964 | 214,209.67 |

ance reserves would be more than 50% of its total reserves, (2) if the Stephenson portion of the health and accident unearned premium reserve must be included in taxpayer's total reserves, it must be included also in the life insurance reserves, again making taxpayer's life insurance reserves more than 50% of its total reserves, and (3) if the Stephenson part of health and accident unearned premium reserve must be included in total reserves, only the net amount must be included so that again taxpayer's life insurance reserves would be more than 50% of the total reserves.

The parties agree that if any one of these methods of calculation is correct, then taxpayer would meet the requirements of Section 801. (See footnote 1.) They agree also that if the gross amount of the Stephenson portion of the health and accident unearned premium reserve *is* included in taxpayer's total reserves, and not included in taxpayer's "life insurance" reserves, taxpayer's life insurance reserve fraction would be less than 50% and the requirement of the statute would not be met.

■ We think that the unearned premium reserve held by Stephenson must be included in the taxpayer's total reserves. Under South Carolina law, Code of Laws of South Carolina § 37–233 (1962), Stephenson was the agent of taxpayer:

§ 37–233. *Who deemed agents of insurance companies.*—Any person who (a) solicits insurance in behalf of any insurance company, (b) takes or transmits other than for himself any application for insurance or any policy of insurance to or from such company, (c) advertises or otherwise gives notice that he will receive or transmit any such application or policy, (d) shall receive or deliver a policy of insurance of any such company, (e) shall examine or inspect any risk, (f) shall receive, collect or transmit any premium of insurance, (g) shall make or forward any diagram of any building or buildings, (h) shall do or perform any other act or thing in the

making or the consummating of any contract of insurance for or with any such company, other than for himself or in (i) shall examine into and adjust or aid in adjusting any loss for or in behalf of any such insurance company, whether any such acts shall be done by an employee of such insurance company or at the instance or request of such insurance company, shall be held to be acting as the agent of such insurance company for which such act is done or risk is taken.

This agency relationship is reflected in the provision of the Group Policy that the effective date of the insurance was that of the loan agreement between an insured-borrower and Stephenson. Despite the agreement between taxpayer and Stephenson allowing monthly remittance of the unearned health and accident premium reserve, possession by Stephenson of this reserve must be deemed possession by taxpayer. "To hold otherwise would be to exalt artifice above reality . . . ." Gregory v. Helvering, 293 U.S. 465, 470, 55 S.Ct. 266, 268, 79 L.Ed. 596 (1934). Since taxpayer is a wholly owned subsidiary of Stephenson in reality the fund in Stephenson's hands was subject to being used to pay taxpayer's obligations and for the benefit of taxpayer whenever taxpayer so desired. *See* Maryland Casualty Co. v. United States, 251 U.S. 342, 347, 40 S.Ct. 155, 157, 64 L.Ed. 297 (1920), in which the Court held that premiums in possession of the agents of the taxpayer-insurance company, to be remitted to the taxpayer sometime after actual receipt, had been received by the taxpayer because they were

subject to use by it in an important respect before they were transmitted to the treasurer of the company, for the agency contract provided that "the agent will pay on demand, out of any funds collected by him for account of premium and not remitted to the company, such drafts as may be drawn on him by the company . . . for the purpose of settling claims, deducting

the amount from the next succeeding monthly remittance;" . . . .

Furthermore, we think that the health and accident unearned premium reserves held by Stephenson is not includible in life insurance reserves. The district court correctly concluded, and the parties do not challenge his conclusion on appeal, that the accident and health insurance, issued by taxpayer does not fall within the definition of "noncancellable" insurance, found in Treas.Reg. § 1.801—3(c):

> (c) Noncancellable life, health, or accident insurance policy. The term "noncancellable life, health, or accident insurance policy" means a health and accident contract, or a health and accident contract combined with a life insurance or annuity contract, which the insurance company is under an obligation to renew or continue at a specified premium and with respect to which a reserve in addition to the unearned premiums . . . must be carried to cover that obligation . . .

The plain language of section 801(b) (1) (B) defines "life insurance reserves" as amounts "set aside to mature or liquidate . . . claims arising from life insurance, annuity, and *noncancellable* health and accident insurance contracts (including life insurance or annuity contracts combined with *noncancellable* health and accident insurance). . . ." (Emphasis added.) Clearly this definition prevents including the health and accident unearned premium reserves in taxpayer's life insurance reserves.

Finally, we believe that the gross amount of the unearned premiums held by Stephenson must be included in taxpayer's total reserves. Taxpayer bases its argument that only the net unearned premiums need be included on the following definition of "unearned premiums" in Treas.Reg. § 1.801—3(e): "amounts which shall cover the cost of carrying the insurance risk for the period for which the premiums have been paid in advance." Taxpayer contends that "cost" means the "morbidity" portion of the unearned premiums (the amount necessary to cover the insurance risk) and does not include the "loading" portion (the amount designed to cover administrative costs, expenses, and profit).

Section 801(c) (2), however, requires that unearned "premiums" be included in total reserves. The universally accepted meaning of "premium" is the amount paid by the insured for coverage. It does not refer to any particular portion of the sum paid by the insured. In the absence of any indication to the contrary, we must assume that Congress intended by use of the "premium" to convey its commonly accepted meaning. Our interpretation is not inconsistent with that of the above-quoted regulation; both the morbidity portion and the loading portion are, we think, "costs" of insuring. Furthermore, our interpretation comports with the traditional assumption of accident and health insurance that the premium is "earned" and all costs are incurred ratably over the period of coverage. Until a prorated portion of the premium is earned, no loading costs are considered due against it. In this sense, the *total* unearned premium is a "reserve" for future obligations.[2]

For the reasons stated, we hold that taxpayer did not qualify as a life insurance company under Section 801. The judgment below will therefore be

Reversed.

---

2. The district court's reliance on Alinco Life Insurance Co. v. United States, 373 F.2d 336, 178 Ct.Cl. 813 (1967), is misplaced. Only life insurance was under consideration in that case and even as to life insurance we are doubtful that "the cost of carrying the insurance risk" is the net, rather than the gross, premium.