PENN SECURITY LIFE INSURANCE
COMPANY

v.

The UNITED STATES.

No. 109–68.

United States Court of Claims.

Oct. 22, 1975.

**1156**

John B. Jones, Jr., Washington, D. C., for plaintiff; Owen T. Armstrong, St. Louis, Mo., attorney of record. Lowenhaupt, Chasnoff, Freeman, Holland & Mellitz, St. Louis, Mo., Robert A. Kagan, New York City, John T. Sapienza, Andrew W. Singer and Covington & Burling, Washington, D. C., of counsel.

Herbert Grossman, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Gilbert E. Andrews and Roger A. Schwartz, New York City, of counsel.

Before COWEN, Chief Judge, and DAVIS, NICHOLS, SKELTON, KASHIWA, KUNZIG and BENNETT, Judges.

PER CURIAM: *

Section 801(a) of the Internal Revenue Code, as amended, defines a life insurance company in the following language:

(a) Life Insurance Company Defined.—For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

(1) its life insurance reserves (as defined in subsection (b)), plus

(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves,

comprise more than 50 percent of its total reserves (as defined in subsection (c)).[1]

In *Alinco Life Insurance Company v. United States*, 373 F.2d 336, 178 Ct.Cl. 813 (1967), the court addressed its attention to the question of whether an insurance company specializing in the reinsuring of *credit life* insurance could qualify as a life insurance company under Section 801, and held that it could, provided it met the 50 percent test. As might have been easily predicted, the question of life insurance company qualification is now back before the court with emphasis, however, on those provisions of Section 801 dealing, not with life insurance, but with health and accident insurance. In applying Section 801 to this case, we appreciate that the statute was *not* "written for ordinary folk * * *" It is addressed to technical specialists (*i. e.,* actuaries) and hence, its provisions "must be read by judges with the minds of the specialists." Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Col.L.Rev. 527, 536 (1947).

On balance, we have concluded that plaintiff-taxpayer has the better of the argument and qualifies as a life insurance company so that it is entitled to recover. To explain why requires, first of all, a description of the taxpayer's method of conducting its insurance business during the years in issue, namely, the calendar years 1963, 1964, and 1965.

In those years, plaintiff's business consisted primarily of reinsuring risks written by three unrelated insurance companies under credit life, accident and health policies on the lives and health of debtors of plaintiff's parent, Aetna Finance Company (Aetna). Aetna was en-

---

* This opinion incorporates the opinion of Trial Judge Lloyd Fletcher, with minor changes and some additions.

1. Section 801 goes on to provide:
        *    *    *    *    *    *
    "(c) *Total Reserves Defined.*—For purposes of subsection (a), the term 'total reserves' means—
    (1) life insurance reserves,

(2) unearned premiums, and unpaid losses (whether or not ascertained), not included in life insurance reserves, and

(3) all other insurance reserves required by law.

"The term 'total reserves' does not include deficiency reserves (within the meaning of subsection (b)(4))."

gaged in the business of making consumer loans through subsidiaries operating over 200 finance company offices in approximately 25 states.

In connection with such loan transactions, it was commonplace for Aetna's borrowers to apply for and receive credit life insurance policies (or group insurance certificates), including health and accident benefits, from one of three insurance companies, namely, Old Republic Life Insurance Company (Old Republic), Pilot Life Insurance Company (Pilot), and National Fidelity Life Insurance Company (National Fidelity). Hereafter, these companies are frequently referred to as "the ceding companies," and plaintiff had separate disability reinsurance treaties in force with each of them during the years involved.

Under the life insurance provisions of these policies, the insurer was required to pay the creditor any outstanding balance of the debt in the event of the insured debtor's death. The health and accident provisions called for the insurer to pay debt installments falling due while the insured was totally disabled and unable to work. The terms of the policies (or group certificates) were coextensive with the contractual term of the related indebtedness, usually two to three years.

Under its reinsurance treaties with the ceding companies, plaintiff agreed to reinsure 100 percent of the liability of each ceding company with respect to disability benefits included in credit life policies issued to Aetna and its borrowers. These treaties provided for payment of reinsurance premiums to plaintiff on a monthly earned premium basis; i. e., a reinsurance premium was payable each month with respect to reinsurance coverage provided during the previous month based on a percentage of premiums "earned" on covered policies during that month.

All of the credit insurance policies issued by the ceding companies called for payment of insurance premiums (both a life insurance premium and, where applicable, a disability premium) at the inception of the policy term. When a disability premium is first received under such a policy, it is wholly "unearned" in the sense that the entire premium is attributable to the unexpired portion of the policy. As the term of the policy expires each month, a proportionate part of the premium becomes "earned" ; i. e., attributable to insurance protection provided during that month.

Thus, to use plaintiff's illustration, if a ceding company received a $360 disability premium on January 1, 1963, with respect to a policy providing insurance coverage for 36 months, one-thirty-sixth of this premium (or $10) would be considered "earned" during the month of January and each succeeding month. The "unearned" premium would be $350 at the end of January, $340 at the end of February, and so on. Under its disability reinsurance treaties, plaintiff was entitled to a monthly reinsurance premium equal to a percentage of the $10 "earned" premium for reinsurance coverage actually provided each month. The ceding companies retained all unearned premiums on policies covered under the disability reinsurance treaties and established an unearned premium reserve in the amount of such unearned premiums for the benefit of their policy holders in accordance with the applicable restrictions of state law and in satisfaction of the reserve requirements of the various states in which they did business.

Since plaintiff received no unearned premiums from the ceding companies, it was not required to establish an unearned premium reserve by the State of Missouri. No actuary or state regulatory authority required plaintiff to establish an unearned premium reserve under its disability reinsurance treaties with the ceding companies, since plaintiff never received premiums thereunder for insurance to be provided in the future or premiums which it might otherwise be required to refund.

Approximately two-thirds of the unearned premium reserves held by the

ceding companies represented unearned "loading" charges made to cover profits and sales and office expenses. The remaining one-third of such unearned premium reserves represented unearned *net* premiums charged to policyholders to cover the expected cost of providing disability insurance benefits; this portion alone (known in the industry as the morbidity element) reflected the amount that the companies were actuarially required to hold in order to pay disability claims as they matured. Unearned loading charges are held as part of unearned premium reserves because the casualty insurance industry has traditionally determined its reserve requirements with regard to the full amount of premiums that would have to be refunded if all policies in force were simultaneously canceled instead of reserving only for the cost of carrying the insurance risk (the unearned *net* premiums) as in life insurance.

As insureds grow older, the mortality or morbidity costs increase and when an accident and health policy is written for a long term of years, the guaranteed level premium charged will not be sufficient to provide benefits after the insured reaches a specified age. In those instances, a reserve, in addition to the pro rata gross unearned premium reserve, is set up out of current premiums to provide for the excess of future benefits over future premiums. No such reserves were created by the three insurers with regard to the credit accident and health policies reinsured with taxpayer, presumably because such policies were relatively short-term.

In addition to its reinsurance treaties with the ceding companies during the years in issue, plaintiff also issued its own group annuity policy on December 22, 1965 (Group Annuity Contract No. 101) to the St. Louis Union Trust Company as trustee of Pension Fund No. 6 of the International Telephone Retirement Plan for Salaried Employees, which contract has remained outstanding and in effect to the present time. Plaintiff received securities valued at $5,929,057.24 for the purchase of single premium annuities under Group Annuity Contract No. 101 on or about December 22, 1965. Prior to this transaction, no group annuity or individual annuity contracts had been purchased by any trustee of any pension fund under the International Telephone Retirement Plan for Salaried Employees on the lives of the individuals covered under Group Annuity Contract No. 101.

Plaintiff maintained a reserve of $6,072,004 on December 31, 1965, with respect to its liabilities under Group Annuity Contract No. 101 on that date. Such reserve was computed on the basis of a recognized mortality table (1959 G.A.) and an assumed rate of interest (3½%), and was set aside to mature or liquidate future unaccrued claims arising under Group Annuity Contract No. 101.

On April 4, 1968, plaintiff filed a petition with this court seeking a refund of income taxes for the years in issue on the grounds, *inter alia,* that it was entitled to deduct accrued and unpaid losses under Section 809(d)(1) of the Code and to take such losses into account in determining the increase in its reserves for those years as provided in Section 809(d)(2) of the Code. On October 24, 1968, a notice of deficiency was mailed to plaintiff with respect to the years covered in plaintiff's petition. The deficiencies proposed therein were based upon the assertion that plaintiff did not qualify as a life insurance company during the years 1963, 1964, and 1965 under Section 801(a) of the Code, and upon that assertion, by an Amended Answer, defendant filed a counterclaim herein.

On February 14, 1969, after the time provided by statute for petitioning the Tax Court had expired but while plaintiff's tax liability for the years covered by the notice of deficiency was still before this court, the Commissioner of Internal Revenue assessed the amount of the asserted deficiencies in plaintiff's income tax, together with interest on such deficiencies, and demanded payment thereof. Plaintiff contested the validity

of this assessment, but paid such amounts under protest on March 5, 1969. On March 30, 1970, plaintiff filed its First Amended Petition with this court seeking recovery of the amounts claimed in its original petition as well as the amounts of the asserted deficiencies paid on March 5, 1969. In its Answer to plaintiff's First Amended Petition, defendant stated that "since the Plaintiff has paid the taxes for which the counterclaim was filed and amended its petition to include a claim for refund for these taxes, a counterclaim by the defendant is no longer necessary, nor required by law."

Plaintiff attacks the validity of the assessment described in the preceding paragraph. The argument is that, at a time when plaintiff had a refund suit pending in this court for the years 1963, 1964, and 1965, defendant determined additional deficiencies for those same years thus bringing into play the provisions of Section 7422(e) of the Internal Revenue Code. In pertinent part, that section reads as follows:

(e) Stay of proceedings.—If the Secretary or his delegate prior to the hearing of a suit brought by a taxpayer in a district court or the Court of Claims for the recovery of any income tax, * * * mails to the taxpayer a notice that a deficiency has been determined in respect of the tax which is the subject matter of taxpayer's suit, the proceedings in taxpayer's suit shall be stayed during the period of time in which the taxpayer may file a petition with the Tax Court for a redetermination of the asserted deficiency, and for 60 days thereafter. If the taxpayer files a petition with the Tax Court, the district court or the Court of Claims, as the case may be, shall lose jurisdiction of taxpayer's suit to whatever extent jurisdiction is acquired by the Tax Court of the subject matter of taxpayer's suit for refund. If the taxpayer does not file a petition with the Tax Court for a redetermination of the asserted deficiency, the United States

may counterclaim in the taxpayer's suit, * * * within the period of the stay of proceedings notwithstanding that the time for such pleading may have otherwise expired. The taxpayer shall have the burden of proof with respect to the issues raised by such counterclaim * * * of the United States except as to the issue of whether the taxpayer has been guilty of fraud with intent to evade tax.

█ Plaintiff asserts that the procedure prescribed in Section 7422(e) invalidates the assessment described above because the section must be read as calling exclusively for a counterclaim. While the argument is an ingenious one, we find it without merit.

First of all, it overlooks the permissive, as opposed to mandatory, wording of Section 7422(e) which merely states that the Government "may counterclaim in the taxpayer's suit." The effect of such language is explained in *Bar L. Ranch, Inc. v. Phinney,* 400 F.2d 90, 92 (5th Cir. 1968) as follows:

In *Flora v. United States,* 1958, 362 U.S. 145, 80 S.Ct. 630, 4 L.Ed.2d 623, the Supreme Court explained that when a taxpayer chooses to remain in the district court in a case similar to the instant case, "the Government may—but seemingly is not required to—bring a counterclaim; and if it does, the taxpayer has the burden of proof." This language indicates that the counterclaim is a permissive one, and that other methods may be used for the collection of the tax. Thus the Court assumed that any assessment of the tax would be valid since a separate collection suit would have to be based on a valid assessment. See also *Florida v. United States,* 8th Cir. 1960, 285 F.2d 596.

The Circuit Court then went on to hold that an assessment, in essence similar to the one disputed here, was valid.

Secondly, plaintiff apparently would ignore the limitations provisions contained in Section 6501 of the Code. That

section requires the Government to assess "within 3 years after the return was filed * * *" By Section 6501(c)(4) that period may be extended by mutual consent of the taxpayer and the Government, a procedure presumably well known to the able and sophisticated tax counsel for this plaintiff. No effort is made to explain why this was not done in the present case.

However, lastly and in all events, the decision for plaintiff on the merits, as below, would seem to render this procedural point moot.

### The Section 801 Issue

■ Turning to the merits, it is necessary at the outset to determine whether plaintiff, under Section 801 of the Internal Revenue Code, qualifies for taxation as a life insurance company. As was pointed out in *Alinco, supra,* 373 F.2d at 350, 178 Ct.Cl. at 838, the qualification formula in Section 801 may be expressed in terms of the following fraction, the quotient of which must be more than 50 percent in order for an insurance company to qualify as a life insurance company:

| Qualifying reserves (numerator) | ÷ | Total reserves (denominator) |
|---|---|---|
| 1. Tabular reserves on life, annuity, and noncancellable accident and health policies | | 1. Tabular reserves on life, annuity, and noncancellable accident and health policies |
| 2. Unearned premiums on noncancellable life, health, or accident policies not included in (1) | | 2. Unearned premiums not included in (1) |
| 3. Unpaid losses on non cancellable life, health, or accident policies not included in (1) | | 3. Unpaid losses not included in (1) |
| | | 4. All other insurance reserves required by law. |

If one goes no further than plaintiff's own books and records, it is clear from the figures set out in finding 14, *infra,* that plaintiff's quotient (or reserve test ratio, it is frequently called) exceeded 50 percent in each taxable year. Defendant does go further, however. Using a process somewhat reminiscent of a Section 482 allocation of income between related corporations, defendant would allocate or, to use its word, attribute to plaintiff the unearned premium reserves of the ceding companies established by them with respect to their disability policies reinsured by plaintiff. Defendant justifies this attribution upon the theory that

reserves must follow the risk and, by increasing the denominator of the above fraction, the effect is to decrease plaintiff's reserve test ratio below 50 percent in each year.

Plaintiff, of course, objects vigorously to this attribution to it from unrelated companies of unearned premium reserves which it was not required to hold, had no right to hold, and did not in fact hold. It points out that, under its reinsurance treaties with the ceding companies, plaintiff neither received nor had any right to receive "unearned premiums" as that term is defined in Treas.Reg. Section 1.801–3(e),[2] because those treaties

**2.** The regulation states that the term "means those amounts which shall cover the cost of carrying the insurance risk *for the period for*

*which the premiums have been paid in advance * * *."* (Emphasis supplied.)

provided that the monthly reinsurance premiums were payable only *after* they had been earned by plaintiff, not in advance. Plaintiff is correct in these contentions.

Presented with a credit reinsurance arrangement essentially identical to the present case, the U. S. District Court for the Southern District of Indiana held for the taxpayer. *Economy Finance Corp. v. United States,* 30 AFTR 2d 72–5446 (July 25, 1972), rev'd, 501 F.2d 466 (7th Cir. 1974), *cert. denied,* 420 U.S. 947, 95 S.Ct. 1328, 43 L.Ed.2d 425 (1975). There, as here, the Government sought to disqualify from life insurance company status reinsurers by adding "unearned premiums" held by a ceding company to their "total reserves." Again like the present case, the reinsurance treaties provided for payment of the reinsurance of credit accident and health risks on a monthly earned premium basis. The District Court found that such "reinsurance on a month-to-month basis is not an uncommon or unaccepted reinsurance arrangement" and in a comprehensive and well-reasoned opinion refused to attribute the ceding company's unearned premium reserves to the reinsurer. 30 AFTR 2d at 72–5451. In this respect, the court found the mode of premium payment conclusive, saying:

\* \* \* An unearned premium reserve is required to be established only with respect to that portion of the premium (or reinsurance premium) which has been received by the insurance company prior to the expiration of the period of coverage to which that premium relates. An insurance company is not required to establish an unearned premium reserve with respect to premiums or reinsurance premiums to be received in the future. Since under the terms of the accident and health Reinsurance Treaties reinsurance premiums were due from Standard Life to National Life and United Life only in the month succeeding the month for which the two reinsurers assumed the risk on the credit accident and health insurance policies issued by Standard Life, those reinsurance premiums were fully earned when received. It therefore would have been improper for National Life or United Life to establish any unearned premium reserve. Since National Life and United Life received only reinsurance premiums which represented payments for the assumption of insurance risks by those companies which had already expired by each reserve date, they were not required to set up unearned premium reserves. No state regulatory agency would have required National Life or United Life to set up unearned premium reserves with respect to the credit accident and health insurance which was issued by Standard Life and reinsured by National Life and United Life. Even without the cancellation provisions in the credit accident and health Reinsurance Treaties, it would not have been proper for National Life or United Life to set up unearned premium reserves since under the terms of those treaties they reinsured risks on a month-to-month basis. Since under the terms of the credit accident and health Reinsurance Treaties National Life or United Life were given the right to cancel the treaties upon giving 30 days' notice, in which event they would have been subject to only a limited amount of liability on policies then in force, an additional reason exists for their not being required to establish unearned premium reserves.

30 AFTR 2d at 72–5452.

We agree with the District Court's reasoning and result. The Seventh Circuit reversed the District Court but we cannot accept the rationale of the majority of the Court of Appeals. It should be noted, first, that the facts in *Economy Finance Corporation* differed from those in the present case in one important respect. Those taxpayers had agreements with the ceding company under which the latter was required to invest most of the unearned premium reserves in subordinated debentures of the

parent of one of the taxpayers, and then to turn over the interest income received on those debentures as an "additional commission" to the insurance agency partnership composed of stockholders of one of the related taxpayers. *See* 501 F.2d at 470. Thus, the *Economy Finance* taxpayers in effect received the proceeds of the unearned reserves even while in the hands of the ceding company. That arrangement was quite different from the one involved in the case at bar and could be understood as making that ceding company the agent of those taxpayers.

But the Court of Appeals, though it referred to that side-arrangement (*see* 501 F.2d at 471, n. 5, 477), did not center its decision thereon. Recognizing that the literal terms of § 801 favor the taxpayer (501 F.2d at 477), the Court of Appeals refused to apply the statute as written because, in its view, that interpretation failed to further Congress's purpose in giving special tax treatment to life insurance companies. That dominant objective the Seventh Circuit took to be the legislative desire to postpone half of the tax on investment income which accrues with respect to much life insurance and which cannot be accurately determined "until the life contract has been completely performed." *See* 501 F.2d at 474, 476–77. Since such investment income is not a factor for the health and accident policies involved in *Economy Finance* and here, the court considered that it would distort the Congressional purpose to allow those policies to be taken into account (without offsetting reserves) in determining whether the companies are entitled to "life insurance company" treatment.

We are far less certain than the Seventh Circuit that this was Congress's overriding aim. Section 801 is a technical provision, carefully worked out in some detail over the years. As Circuit Judge Stevens pointed out in dissent in the *Economy Finance* case, Congress could have differentiated "life insurance companies" from others for tax purposes by selecting any of a number of measur-

ing rods, but it chose a simple reserve-ratio test which has the advantage of being hinged to the requirements of state authorities as to the maintenance of adequate reserves. 501 F.2d at 483. The legislative history does not indicate that Congress zeroed in on policies connected with underwriting · income. Indeed, the reserve-ratio criterion was initially selected by Congress decades before the enactment of the current provisions for deferring part of the underwriting gain, at a time when Congress viewed premium receipts as not taxable because not true income but rather as analogous to permanent capital investment. *See Helvering v. Oregon Mutual Life Ins. Co.,* 311 U.S. 267, 268–69, 61 S.Ct. 207, 85 L.Ed. 180 (1940); *Alinco Life Ins. Co. v. United States, supra,* 373 F.2d at 346, 178 Ct.Cl. at 831. Moreover, Congress imposed statutory limits on the amount of deferrable underwriting income (*see* § 815(d)(4)), and there is no certainty that a company qualified as a "life insurance company" would be able to take full advantage of that privilege, perhaps not at all.

■ Still another indication, in our view, that Congress probably did not intend to restrict the concept of "life insurance company" to those firms having a predominance of policies yielding deferrable underwriting income is the Code's treatment of "modified coinsurance." In that situation the ceding company holds the reserves on reinsured risks, but also pays over the investment income from the reserve to the reinsurer. Congress has provided in § 820 that the reinsurer may, though it need not, take the ceding company's reserve into account but only if both parties consent to this treatment. *See also* Rev.Rul. 70–508, 1970–2 C.B. 136. As taxpayer points out, this would result in the anomaly, under the Seventh Circuit's opinion, that a reinsurer may successfully avoid attribution if it has the ceding company pay over gross investment income from the reserve, but must accept attribution when the ceding company not only holds the reserve but keeps the in-

vestment income. Defendant's response is that § 820 does not relate to qualification as a "life insurance company" but only to the determination of taxable-investment income and gain, once qualification has been established. This is true but does not destroy the point that it is doubtful that Congress gave special treatment to life insurance companies primarily because of their underwriting income.

In addition, the consequences of the general rule laid down by the Court of Appeals are uncertain and unclear. Judge Stevens thought the majority's standard might well exclude from coverage under § 801 such a common form of life insurance as term insurance. *See* 501 F.2d at 486 n. 7. There may be other untoward gaps or disharmonies. We cannot tell because the consequences of departing from the text of § 801 are opaque.

In these circumstances, it seems to us preferable to accept the statute as written, leaving to Congress the function of closing loopholes (if they exist) or restructuring the provision in greater detail. The section is technical and specific, directed to a complicated but very narrow segment of the law. If there be some anomalies under the statute as it stands, the Congress is in far better position to clarify its purpose and to harmonize § 801 with the other provisions of the insurance portion of the Code. Though there may be some results which can be questioned on economic or actuarial grounds, the literal words of the section do not produce absurd results, or results which one can say are clearly contrary to the legislative purpose. *Cf. United States v. Olympic Radio & Television Co.,* 349 U.S. 232, 236, 75 S.Ct. 733, 99 L.Ed. 1024 (1955). We agree therefore with Circuit Judge Stevens, dissenting in *Economy Finance* (501 F.2d at 485): " * * * the government's conclusion that life insurance represents less than half of taxpayers' total insurance business rests on a non-statutory standard. Congress may have acted unwisely in giving preferential tax treatment

to life insurance companies, and it may have been unwise to select a reserve-ratio test as the definition of a life insurance company for tax purposes. Nevertheless, we must, of course, apply the test which Congress has specified."

Defendant also urges that a different result is called for by a recent decision by the Fourth Circuit Court of Appeals in *Superior Life Insurance Company v. United States,* 462 F.2d 945 (4th Cir. 1972). In our view, defendant's reliance on that case is entirely misplaced. *Superior Life* did not involve reinsurance. The unearned premiums there involved were collected and held by the taxpayer's parent company (a finance company, not an insurer) under a group insurance policy issued by the taxpayer. The parent acted merely as the taxpayer's agent and "in reality the fund in [the parent's] hands was subject to being used to pay taxpayer's obligations and for the benefit of taxpayer whenever taxpayer so desired." *See Superior Life Ins. Co. v. United States, supra,* at 950. None of the facts on which the decision in *Superior Life* turned—(1) the agency relationship between the holder of the premiums and the insurance company, (2) the free availability of the unearned premiums to the insurance company, and (3) identity of control between the parent-agent and subsidiary-insurance company—is present here. Since the taxpayer in *Superior Life* "constructively received" unearned premiums under long-accepted principles of tax law, the Fourth Circuit's decision is entirely consistent with the fact that the existence of unearned premium depends upon the mode of premium payment.

On this phase of the case, mention should be made of plaintiff's argument that defendant's "reserves follow the risk" rule has been recently rejected by this court in *Title Guarantee Co. v. United States,* 432 F.2d 1363, 193 Ct.Cl. 1 (1970). Defendant continues to urge, however, that the earlier decision of *Colonial Surety Co. v. United States,* 178 F.Supp. 600, 147 Ct.Cl. 643 (1959), established a "reserves follow the risk" rule

for tax purposes. But in *Title Guarantee* the court rejected that argument and distinguished the *Colonial Surety* case as follows:

> \* \* \* The plaintiff [in the *Colonial Surety* case] sought to deduct *unearned commissions and not unearned premiums.* \* \* \*

> The government argues that the portion of the trust fund attributable to the parts of the policies reinsured should not be considered as unearned premiums \* \* \* for the reason that the taxpayer is no longer carrying the risk on the parts reinsured. *We cannot accept this theory.* Even though plaintiff has obtained reinsurance, it is still liable to the policyholder in case of loss and is, therefore, still carrying the risk despite the reinsurance.

*Title Guarantee Co. v. United States, supra,* 432 F.2d at 1376, 193 Ct.Cl. at 25 (emphasis added).

Finally, at a later stage in this litigation the court itself injected an issue which had not been presented to the trial judge or to the three-judge panel of the court which first heard the argument. As a result of the decision by a different trial judge in *Consumer Life Ins. Co. v. United States,* Ct.Cl., 524 F.2d 1167, the court ordered the parties to brief and argue the question of whether *state law* required the taxpayer to establish an insurance reserve for the unearned premiums involved here (if so the case would be governed by Section 801(c)(3), *supra* note 1, and the taxpayer would lose). The case was then ordered to be heard en banc.[3] It has since been held awaiting the decision in *Consumer Life Ins. Co.* which was argued somewhat later. That case is also being decided today, and on the new issue of the requirements of state law we dispose of this case on the reasoning of the court's opinion in *Consumer Life*—Missouri law did not require taxpayer to establish reserves for the premiums involved here.[4]

From all the foregoing, it is concluded that defendant's attempt to attribute to plaintiff the unearned premiums reserves actually held by the ceding companies is incorrect. Accordingly, plaintiff's reserve test ratio for 1963 was 68.-50 percent, for 1964 was 54.48 percent, and for 1965 was 85.76 percent. *See* finding 14, *infra.* Therefore, plaintiff qualified in those years as a life insurance company under Section 801, and it is unnecessary to reach alternative arguments made by counsel for the parties.

### *Plaintiff's Group Annuity Policy No. 101*

On December 22, 1965, plaintiff issued its own group annuity policy No. 101 to the St. Louis Union Trust Co. as trustee of Pension Fund No. 6 of the International Telephone Retirement Plan for Salaried Employees. On December 31, 1965, plaintiff's reserve held with respect to annuities purchased under this policy was $6,072,004. In computing the amount of its reserves under Section 801(b)(5) which requires life insurance companies to use the mean of reserves held at the beginning and end of the year, plaintiff included $3,036,002 (0 + $6,072,004 ÷ 2) with respect to this annuity policy.

Defendant recomputed the annuity reserves under Section 806(a) by adjusting them on a daily basis. This adjustment was accomplished by applying a fraction to the reserve, the numerator of which was the number of days during the year in which the reserve was held and the denominator of which was the number of

---

**3.** This was done before the three-judge panel had rendered its decision.

**4.** *See* Findings of Fact 19, 20, 21, 22, 28, and especially 29 *infra.* Defendant relies mainly on *Vernon's Annotated Missouri Statutes* § 376.410(1), (3), and (4), but the text of those provisions fully harmonizes with the interpretation of Missouri law spelled out in our findings and followed by the Missouri insurance administrators, *i. e.,* that Missouri law did not during the years in question require this taxpayer to set up the reserves in question.

days in the year, and the result was to reduce plaintiff's year-end reserve to $502,156. Claiming this adjustment to be entirely erroneous, plaintiff asserts that neither the language nor the purpose of Section 806(a) covers reserves held under a newly issued policy by the original insurer, as was the case of Annuity Policy No. 101. Section 806(a) reads:

> For purposes of this part, if, during the taxable year, there is a change in life insurance reserves attributable to the transfer between the taxpayer and another person of liabilities under contracts taken into account in computing such reserves, then, under regulations prescribed by the Secretary or his delegate, the means of such reserves, and the mean of the assets, shall be approximately adjusted, on a daily basis, to reflect the amounts involved in such transfer. This subsection shall not apply to reinsurance ceded to the taxpayer or to another person.

Plaintiff argues that this section was designed by Congress exclusively to deal with acquisitions of reserves by one insurance company from another insurance company in those cases (commonly referred to as "assumption reinsurance") where the acquiring company becomes solely liable in place of the transferor company on the insurance contracts under which the acquired reserves are held. Clearly this did not occur in the present case, and the argument is that, therefore, Section 806(a) cannot apply but instead the more general averaging provisions of Section 801(b)(5) govern.

From the admittedly rather sparse legislative history, plaintiff would seem to be correct in this contention. For example, the following appears in S.Rep. No. 291, 86th Cong., 1st Sess. 51 (1959) (1959–2 C.B. 807):

> * * * Subsection (a) of your committee's new section 806 relates to situations where there is a change in life insurance reserves (either increases or decreases) attributable to the transfer of liabilities under contracts taken into account in computing such reserves. This occurs, for example, when life insurance company I purchases all or a part of the business of life insurance company X under an arrangement (sometimes referred to as "assumption reinsurance") whereby company I becomes solely liable to the policy holders. Both I and X will have to make the adjustments provided by subsection (a). U.S.Code Cong. & Admin. News 1959, p. 1626.

The illustration which follows the above excerpt, as well as the examples given in Treas.Reg. Section 1.806–3(a), all deal with transactions and transfers between insurance companies.

Defendant agrees that the examples cited all illustrate transfers between insurance companies but counters with the observation that the regulations and Committee Reports do not specifically limit the section in the manner contended for by plaintiff and points to the language of the statute which covers transfers "between the taxpayer and *another person*." (emphasis supplied.) If Congress intended to limit the applicability of Section 806(a) to transfers between insurance companies, defendant suggests it would have used the phrase "insurance company" instead of the word "person." This is an appealing argument, but, in our view, it is clearly offset by plaintiff's rational rejoinder that Congress used the term "person" with a view to reaching all acquisitions of reserves under *pre-existing insurance* contracts, including those in which the transferor may not qualify as an insurance company for *tax purposes,* and not to require a special adjustment of reserves when a *new* policy is issued to the trustee of a pension plan, such as St. Louis Union Trust Co.

Plaintiff also seems on sound ground in contending that the inapplicability of Section 806(a) to the issuance of a new insurance contract is manifest in defendant's inability to show here any "liabilities" on the part of the transferor, any "transfer" of such "liabilities," and any reserves computed on the basis of the

transferor's "liabilities." It is not disputed that under the IT&T pension plan the employer had no liability for the payment of benefits nor that under the trust agreement the trustee was not liable for losses other than those resulting from its own neglect.

Nonetheless, says defendant, their fiduciary duties and obligations under the plan constituted "essentially an insurance function." However, as plaintiff observes, this misconceives the nature of the fiduciary relationship. It is hornbook law that a trustee is not an insurer but at most has the responsibility prudently to manage the trust funds in accordance with the purpose set forth in the trust instrument. *See* 3 Scott on Trusts § 204 (3d ed. 1967).

Finally, it can hardly be disputed that the annuity reserves in question were established as a result of liabilities incurred by plaintiff under its annuity policy No. 101 and were not attributable to "liabilities" assumed by plaintiff under the pension plan or the trust agreement. Hence, Section 806(a) does not apply.

### The Unpaid Losses Deduction Issue

It is not disputed that in computing its "gain from operations" as defined in Section 809(b), plaintiff was entitled to a deduction under Section 809(d)(1) for accrued and unpaid losses of $120,596 in 1963, $55,605 in 1964, and $30,000 in 1965. The present problem arises because plaintiff asks to deduct them again under Section 809(d)(2) which allows a deduction for an increase in certain reserves, including the reserve for unpaid losses. If this were permitted, the Government contends that the same item would be deducted twice in violation of Section 818(f) which reads:

(f) *Denial of double deductions.* —Nothing in this part shall permit the same item to be deducted more than once under subpart B and once under subpart C.

The Government also points to Treas. Reg. Section 1.809–5(b) which expressly bars the double deduction of unpaid losses and an increase in unpaid loss reserves in the following language:

(b) *Denial of double deduction.* Nothing in section 809(d) shall permit the same item to be deducted more than once in determining gain or loss from operations. For example, if an item is allowed as a deduction for the taxable year by reason of its being a loss incurred within such taxable year (whether or not ascertained) under section 809(d)(1), such item, or any portion thereof, shall not also be allowed as a deduction for such taxable year under section 809(d)(2).

There can simply be no doubt that the example given in the above regulation specifically proscribes the 809(d)(2) deduction here claimed by plaintiff. Therefore, to hold for plaintiff would necessarily require a determination that the regulation is invalid, and such a determination is not permissible in our view.

Plaintiff has made no showing that the departmental construction exemplified in this regulation is so unreasonable as to require a holding of invalidity, and long ago the Supreme Court had the following to say in *Boske v. Comingore,* 177 U.S. 459 at 470, 20 S.Ct. 701 at 706, 44 L.Ed. 846 (1900):

Those who insist that * * * a regulation is invalid must make its invalidity so manifest that the court has no choice except to hold that the Secretary has exceeded his authority and employed means that are not at all appropriate to the end specified in the act of Congress.

Plaintiff's heavy reliance on *Title Guarantee, supra,* is misplaced, for there the court was not confronted with the necessity of holding a regulation invalid. Hence, as to this issue it is our view that the Government's position is correct.

Since, however, plaintiff should prevail on other remaining issues, as discussed above, it is entitled to recover with the amount thereof to be determined in further proceedings under Rule 131(c).

NICHOLS, Judge (dissenting):

Upon a careful reading of *Economy Finance Corp. v. United States,* 501 F.2d 466 (7th Cir. 1974), *cert. denied,* 420 U.S. 947, 95 S.Ct. 1328, 43 L.Ed.2d 425 (1975), I find it applies the text in IRC § 801(a), defining a Life Insurance Company in a sound and persuasive fashion. To avoid needless expansion of these remarks, I incorporate herein the analysis of the panel majority by reference so far as pertinent here. Were they less convincing than they are—unless plainly wrong—our respect for *stare decisis* and our dislike for going into conflict with another court should have carried the day. The objectionable consequences of conflicting lines of decisions in Federal tax cases are fully set forth in the *Preliminary Report of the Commission on Revision of the Federal Court Appellate System,* App. IV. This deals with the "Relitigation Policy" attributed to defendant, but relitigation by diverse taxpayers pursuing a common scheme or plan of tax avoidance is just as objectionable.

Defendant, with the authority of the Seventh Circuit behind it, would "impute" to plaintiff reserves under H & A policies it has arranged to have ostensibly carried for it by others, though in reality it bears the risk of loss itself. When such reserves are so "imputed" the plaintiff fails to pass the 50% test and is not entitled to the special advantages enjoyed by life insurance companies. As the Seventh Circuit shows, non-imputation completely frustrates the purpose Congress has in mind in prescribing the test. The contrary view is simply another instance of stating: "we see what you mean, Congress, but you said it wrong." To a simple, uncomplicated mind, the imputation is fully justified by the ancient maxim: *"Qui facit per alium, facit per se."* Plaintiff maintains the reserves for purposes of the 801(a) test, though for no other purposes, because it has arranged, itself or through its affiliates, and using the economic leverage they jointly possess, to have these reserves available to satisfy the right the H & A policy holders possess to have their risks covered by legally acceptable reserves.

**CONSUMER LIFE INSURANCE COMPANY**

v.

**The UNITED STATES.**

**No. 463–70.**

United States Court of Claims.

Oct. 22, 1975.

