**WESTERN NATIONAL MUTUAL INSURANCE COMPANY, Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

No. 94–2961.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 16, 1995.

Decided Sept. 1, 1995.

David Pincus, Washington, DC, argued (Gary R. Allen and Edward T. Perelmuter, on the brief), for appellant.

E.P. Baker, Washington, DC, argued (Jay B. Kelly, St. Paul, MN, and Peter H. Winslow, Washington, DC, on the brief), for appellee.

Before BOWMAN, BEAM, and MURPHY, Circuit Judges.

BOWMAN, Circuit Judge.

The Commissioner of Internal Revenue (Commissioner) appeals the Tax Court's determination that there was no deficiency in Western National Mutual Insurance Company's income tax for 1987. We affirm.

## I.

The taxpayer, Western National Mutual Insurance Company (Western), is a property and casualty insurance company engaged in the business of writing a wide variety of insurance policies. Western, like other property and casualty insurance companies, maintains reserves to cover unpaid losses; that is, losses that have been reported but not yet paid, or losses that have been incurred but not yet reported. Prior to enactment of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085 (TRA of 1986), the unpaid losses covered by these reserves were "losses incurred" for which Western was entitled to a full deduction under I.R.C. § 832(b)(5) (1982). In effect, Western could obtain a current deduction for a loss that it might not actually pay until some later year. To eliminate this advantage to the taxpayer, the TRA of 1986 provides that for taxable years beginning after December 31, 1986, only part of total reserves for unpaid losses may be deducted. I.R.C. § 846 (1988 & Supp. V 1993) and Treas.Regs. § 1.846–1 (1992) provide the mechanism by which unpaid losses are discounted to account for the time value of money, and the taxpayer may deduct only the discounted value of the reserves.

The impact of the new discounting rules was to be mitigated by use of a transitional rule supplied by the TRA of 1986. Under this "fresh start" provision, applicable only to the 1986 taxable year, a property and casualty company is entitled to forgiveness of income in an amount equal to the difference between discounted and undiscounted unpaid losses at the end of that year. Nevertheless, because a property and casualty company anticipating application of the transitional rule could substantially increase the amount of income forgiven by artificially inflating its loss reserves for the 1986 taxable year, § 1023(e)(3)(B) of the TRA of 1986 provides that the fresh start rule "shall not apply to any *reserve strengthening* in a taxable year beginning in 1986." 100 Stat. at 2404 (emphasis added). What Congress meant by "reserve strengthening" as the term is used in § 1023(e)(3)(B) is the central issue in this case.

The Commissioner argues that under Treas.Reg. § 1.846–3, reserve strengthening means any increase in a property and casualty company's reserves. Under the Commissioner's approach, the increase in Western's 1986 reserves over its 1985 reserves constituted reserve strengthening, which disqualified Western from obtaining a deduction under the fresh start provision. Western, on the other hand, contends that in the insurance industry reserve strengthening is understood to occur only if a property and casualty company's reserves are increased as a result of a change in the assumptions or methodologies used by the company for computing reserves. Western argues that it was this industry meaning of reserve strengthening that Congress had in mind when it used the phrase in § 1023(e)(3)(B). Under this approach, Western's adjustments to its reserves would not have constituted reserve strengthening and Western would have been entitled to the fresh start deduction.

The Tax Court held that Treas.Reg. § 1.846–3 was invalid because the regulation's use of the term reserve strengthening did not comport with the statutory use and purpose of the term. Based on a thorough review of the statute's legislative history, the Court held that Congress intended that the statute incorporate the insurance industry's well-understood definition of reserve strengthening. That holding resolved the case, the parties having agreed that under the industry's accepted definition of reserve strengthening, Western had not engaged in reserve strengthening with respect to its 1986 loss reserve. Accordingly, the court

entered its decision sustaining Western's position. On appeal, the Commissioner challenges the Tax Court's invalidation of Treas. Reg. § 1.846–3. We exercise plenary review over the question of the validity of a treasury regulation. *See Armstrong World Indus., Inc. v. Commissioner*, 974 F.2d 422, 429–30 (3d Cir.1992).

## II.

■ The Commissioner contends that the Tax Court was required to defer to the construction of reserve strengthening set forth in Treas.Reg. § 1.846–3 because the regulation is reasonable and is not plainly inconsistent with the statute it purports to implement. *See Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). However, the Commissioner's argument begs the question whether a regulatory definition of reserve strengthening is even necessary. We discern three possibilities with respect to the definition of reserve strengthening: (1) the term is defined by the statute; or (2) Congress intended the term to be defined by industry usage; or (3) the term is ambiguous. Only in the last case, *i.e.*, only if the term is ambiguous, may we properly shift our attention to the definition set forth in Treas.Reg. § 1.846–3. Accordingly, we begin our analysis with an examination of the statute itself. *See Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

Section 1023(e)(3)(B) provides in relevant part as follows:

(B) Reserve strengthening in years after 1985.—

Subparagraph (A) [the fresh start provision] shall not apply to any reserve strengthening in a taxable year beginning in 1986, and such strengthening shall be treated as occurring in the taxpayer's 1st taxable year beginning after December 31, 1986.

The meaning of reserve strengthening is not immediately apparent from the face of this provision. The statute does not provide a definition of the term elsewhere, and we search § 1023(e)(3)(B) in vain for any clarification of the activity Congress intended to proscribe. Thus, absent a statutory definition, reserve strengthening must be either a term readily understood within the industry or one that is plainly ambiguous and that requires regulatory definition.

In light of the context in which the provision at issue appears, it seems fair to conclude that it was not drafted with the lay reader in mind. *See Penn Sec. Life Ins. Co. v. United States*, 524 F.2d 1155, 1156 (Ct.Cl. 1975), *aff'd*, 430 U.S. 725, 97 S.Ct. 1440, 52 L.Ed.2d 4 (1977). Like the rest of subchapter L of the Internal Revenue Code, Section 1023(e)(3)(B) is devoted to taxation of the insurance industry and, unsurprisingly, makes substantial use of language peculiar to that industry. *See Continental Ins. Co. v. United States*, 474 F.2d 661, 666 (Ct.Cl.1973) (observing that "[t]he terminology and concepts of the Internal Revenue Code ... dealing with casualty insurance are based directly on industry usage developed in response to state regulation."). We believe that reserve strengthening is an example of congressional employment of industry language and that Congress used the term reserve strengthening with full knowledge of its etymology and with the intent that its industry meaning be controlling. *See McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342, 111 S.Ct. 807, 811, 112 L.Ed.2d 866 (1991) (noting that, in absence of contrary indication, when statute uses term of art, Congress intends its established meaning). Our conclusion is supported both by the Internal Revenue Service's use of the term in Treas.Reg. §§ 1.806–4(b), Ex. (1) (1960), 1.809–5(a)(5)(iii) (as amended 1969), and 1.810–3(a) (1961) (life insurance provisions equating reserve strengthening with change in basis of computing reserves), and by case law recognizing a well-understood industry meaning for reserve strengthening, *see, e.g., Jefferson Standard Life Ins. Co. v. United States*, 408 F.2d 842, 850 (4th Cir.), *cert. denied*, 396 U.S. 828, 90 S.Ct. 77, 24 L.Ed.2d 78 (1969); *National Life & Accident Ins. Co. v. United States*, 381 F.Supp. 1034, 1044–46 (M.D.Tenn.1974), *aff'd*, 524 F.2d 559 (6th Cir.1975); *see also*, Expert Op.Rpt. of Julius Vogel, *reprinted in* Commissioner's App. at 26. As the Tax Court noted, in the life insurance industry

reserve strengthening occurs "when a method or assumption used in calculating policy reserves is changed so as to produce higher reserves." *Western Nat'l Mut. Ins. Co. v. Commissioner*, 102 T.C. 338, 351, 1994 WL 60382 (1994).

Although conceding that reserve strengthening has a commonly understood meaning in the life insurance industry, the Commissioner argues that there is no accepted definition of the term in the property and casualty industry. We disagree. In prior rulings applicable to property and casualty companies, the Commissioner himself has equated reserve strengthening with a change in the method of computing reserves. *See* Rev.Rul. 78–354, 1978–2 C.B. 190; Rev.Rul. 65–240, 1965–2 C.B. 236. We see no statutory basis for the Commissioner's present attempt to make reserve strengthening mean one thing in the life insurance industry but another in the property and casualty industry. Moreover, the Tax Court's determination that reserve strengthening has a settled meaning in the property and casualty industry consistent with its settled meaning in the life insurance industry finds ample support in the record. *See* Expert Op.Rpt. of Irene K. Bass at 26, *reprinted in* Commissioner's App. at 97 (opining that in property and casualty industry reserve strengthening refers to a "one-time (or, at least, unusual and non-periodic), significant change in the assumptions and/or methodologies used to compute the reserves which results in a material change to the relative level of adequacy of the total reserve inventory."); Expert Op. Rpt. of W. James MacGinnitie at 3, *reprinted in* Commissioner's App. at 125 (concurring in report of Irene K. Bass).

Even if there were no property and casualty industry definition of reserve strengthening, a conclusion we have rejected, we see nothing that would prohibit Congress from appropriating the life insurance standard and applying it to a property and casualty provision of the Code. In any event, we hold that Congress intended to deny the fresh start deduction only to those property and casual-

ty companies that computed their 1986 unpaid loss reserves on the basis of methodologies or assumptions that were different from the methodologies or assumptions used in computing the same reserves in prior years.

■ Our determination carries with it the corollary conclusion that reserve strengthening is not an ambiguous term.[1] Thus, we need not look to the Conference Committee report or other legislative history materials to divine the term's meaning. If, from a reading of the statute itself, "the intent of Congress is clear, that is the end of the matter; for the court … must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). In addition, having reviewed the legislative history out of an abundance of caution, we agree with the Tax Court that it "provides no persuasive rationale for interpreting the statutory term 'reserve strengthening' in a manner different from industry usage." *Western Nat'l*, 102 T.C. at 355.

Finally, we are unpersuaded by the Commissioner's claim that administration of § 1023(e)(3)(B) will be unduly burdensome if we adopt an industry definition of reserve strengthening. As the Tax Court correctly observed, the provision at issue here is a transitional rule applicable to a single tax year for which the normal three-year period of assessment has long since expired. Accordingly, concerns about compliance and administrative convenience are entitled to little weight, and could not in any event override the statute's unambiguous meaning.

■ In sum, we are led inexorably to the conclusion that Treas.Reg. § 1.846–3 is invalid to the extent that it adopts a definition of reserve strengthening that is at variance with industry usage. We already have determined that the statute incorporates industry usage. The regulation perhaps provides, as the Commissioner argues, a reasonable and easily administered definition of reserve strengthening, but that definition is nevertheless inconsistent with the statutory mean-

1. We reject the Commissioner's argument that the statute must be regarded as ambiguous merely because an expert was retained to explain to the Tax Court the meaning attributed to reserve strengthening by the insurance industry and therefore by Congress.

ing. We are not free to sustain a regulation "when that regulation is fundamentally at odds with the manifest congressional design." *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 26, 102 S.Ct. 821, 828, 70 L.Ed.2d 792 (1982). Here, the regulation's definition of reserve strengthening conflicts with the manifest congressional design, and therefore the regulation cannot be sustained.

### III.

For the foregoing reasons, the decision of the Tax Court is affirmed.

C.J. May, III, Dubuque, IA, for appellant.