T.C. Memo. 1996-75

UNITED STATES TAX COURT

ATLANTIC MUTUAL INSURANCE COMPANY AND INCLUDIBLE SUBSIDIARIES,
Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25767-93.                    Filed February 22, 1996.

<u>John S. Breckinridge, Jr.,</u> and <u>James H. Kenworthy</u>, for
petitioners.

<u>Phillip A. Pillar</u> and <u>Maureen Nelson</u>, for respondent.

MEMORANDUM OPINION

FOLEY, <u>Judge</u>:  Respondent determined a deficiency of

$519,987 in petitioners' Federal income tax for the 1987 taxable

year as a result of alleged "reserve strengthening".  Under the

Tax Reform Act of 1986 (TRA '86), Pub. L. 99-514, sec. 1023, 100 Stat. 2085, 2404, any increases in the loss reserves maintained by property and casualty insurance companies that constitute "reserve strengthening" do not qualify for a one-time tax benefit. In this case, respondent contends that the term "reserve strengthening" refers to all increases in loss reserves, while petitioners maintain that the term refers to only those increases in loss reserves that are attributable to changes in computation methods or assumptions. Respondent's interpretation of the term "reserve strengthening" is set forth in section 1.846-3(c), Income Tax Regs. The deficiency in this case is based on that regulation. In light of this Court's decision in Western Natl. Mut. Ins. Co. v. Commissioner, 102 T.C. 338 (1994), affd. 65 F.3d 90 (8th Cir. 1995), we hold for petitioners.

Background

The facts have been fully stipulated under Rule 122 of the Tax Court Rules of Practice and Procedure and are so found. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue.

Atlantic Mutual Insurance Co. (Atlantic) is the common parent of an affiliated group of corporations within the meaning of section 1504(a). Atlantic filed consolidated income tax returns on behalf of the group for all relevant years. At the time the petition in this case was filed, Atlantic's principal place of business was in Madison, New Jersey.

Atlantic was organized in 1842 under the laws of the State of New York as a mutual marine insurer. Over the years, Atlantic has expanded its insurance underwriting activities to include most lines of insurance business available to a property and casualty (P&C) insurer. Centennial Insurance Co. (Centennial), a wholly owned subsidiary of Atlantic, is a P&C insurance company included in Atlantic's consolidated return. Because respondent's notice of deficiency relates to the activities of both Atlantic and Centennial, we will refer to the two corporations together as petitioner.

From 1985 through 1993, petitioner filed an annual statement with the insurance department of each State in which petitioner was licensed to conduct insurance business. Each annual statement was prepared in the format prescribed by the National Association of Insurance Commissioners (NAIC). A primary purpose of the annual statement is to provide State insurance commissioners with information concerning a P&C insurer's financial condition. The accounting principles on which the NAIC-prescribed annual statement is based generally have been incorporated into the Internal Revenue Code sections applicable to P&C insurers.

On the annual statement, P&C insurers are required to report estimates of amounts they expect to pay to cover losses that have already occurred. These estimates are commonly referred to as "loss reserves" (or simply "reserves"). Petitioner maintained

three categories of loss reserves: (1) Case reserves, which reflect estimates of amounts to be paid to resolve claims that have been reported to petitioner; (2) incurred but not yet reported (IBNR) reserves, which reflect estimates of amounts to be paid to resolve claims statistically presumed to have been incurred but not yet reported to petitioner; and (3) loss adjustment expense (LAE) reserves, which reflect estimates of administrative costs to be paid in settling or otherwise resolving claims. For the years in issue, case reserves constituted the majority of petitioner's loss reserves.

Petitioner established its case reserves by assigning a claims adjuster to examine each reported claim and estimate the ultimate amount, if any, that would be paid to resolve it. Case reserves simply comprised the aggregate of those estimates. Overall, petitioner's case reserves totaled $255,655,141 at yearend 1985 and $277,705,661 at yearend 1986.

Petitioner established its IBNR reserves by applying a "counts and averages" methodology to each line of insurance business. Under this method, petitioner computed its IBNR reserves by multiplying (1) the number of claims that it presumed would be reported after the accident year by (2) the average cost it projected to resolve each late-reported claim. Petitioner based its estimate of these numbers on its experience in prior accident years and then adjusted the results to reflect actuarial quarterly reviews of the loss reserves for the preceding year.

Senior management had discretion in determining the size of the adjustments. Management made downward adjustments to petitioner's IBNR reserves of $1,200,000 for 1985 and $100,000 for 1986. Overall, petitioner's IBNR reserves totaled $93,713,687 at yearend 1985 and $111,708,986 at yearend 1986.

Petitioner established its LAE reserves through a combination of individual case estimates, formulas, and judgmental factors. To arrive at an estimate of LAE reserves, petitioner calculated the ratio of LAE it paid during a preceding 3-year period to total losses it paid during the same period and used that ratio as a component in certain formulas. Petitioner maintained two categories of LAE reserves: (1) Allocated loss adjustment expenses (ALAE), which consisted of expenses assignable to individual claims (e.g., legal fees and costs), and (2) unallocated loss adjustment expenses (ULAE), which consisted of expenses not assignable to individual claims (e.g., rent allocable to the claims department). Petitioner used different formulas to compute each category of its LAE reserves. Petitioner's management then adjusted the ALAE (but not the ULAE) estimate based on quarterly loss and LAE reviews. Overall, petitioner's LAE reserves totaled $72,317,450 at yearend 1985 and $84,066,519 at yearend 1986.

Respondent tested for "reserve strengthening" by applying the formula set forth in section 1.846-3(c)(3), Income Tax Regs., to each of petitioner's lines of insurance business for pre-1986

accident years. Under the formula, petitioner's reserves at yearend 1985 were reduced by the claims and the LAE paid in 1986 with respect to those reserves. To the extent that, at yearend 1986, a reserve was greater than the amount determined under the formula, the excess was treated as a net increase to that reserve account (i.e., "reserve strengthening"). To the extent that, at yearend 1986, a reserve was less than the amount determined under the formula, the difference was treated as a net decrease to that reserve account (i.e., "reserve weakening").

Respondent determined that, at yearend 1986, petitioner's "reserve strengthening" totaled the following amounts:

| Line of Business | Reserve Strengthening (Weakening) |
|---|---|
| Auto liability ..................... | ($10,559,423) |
| Other liability ..................... | (1,279,374) |
| Workers' compensation ............... | 4,691,659 |
| Multiple peril ..................... | 15,585,877 |
| Schedule O[1] (1985) ................. | (3,870,000) |
| Schedule O (pre-1985) .............. | 1,984,000 |
| Net total ..................... | 6,552,739 |

[1]Schedule O, a part of the annual statement filed with the National Association of Insurance Commissioners, contains combined loss data on several lines of insurance business with respect to which claims are filed and settled within a relatively short period.

Respondent then discounted, pursuant to section 846, the amount determined as "reserve strengthening" in order to calculate the effect on petitioner's gross income.[1] After

[1]For a discussion of sec. 846 and discounting generally, see sec. I.A., "The Change from Undiscounted to Discounted Reserve Accounting", in the Discussion section of this opinion.

discounting the amounts shown in the foregoing chart, respondent determined that petitioner understated its 1987 income as follows:

| Line of Business | Income Adjustment |
|---|---|
| Auto liability ...................... | ($1,211,842) |
| Other liability ..................... | (309,970) |
| Workers' compensation ............... | 1,211,652 |
| Multiple peril ...................... | 1,783,897 |
| Schedule O (1985) ................... | (239,446) |
| Schedule O (pre-1985) ............... | 104,748 |
| Net total ........................ | 1,339,039 |

Respondent further determined that this $1,339,039 understatement of petitioner's 1987 income resulted in a $519,987 understatement of petitioner's 1987 income tax liability.

## Discussion

I. Overview

TRA '86 substantially revised the rules that govern the taxation of P&C insurance companies by requiring P&C insurers to discount loss reserves for purposes of section 832(b)(5) (discussed below). The change from undiscounted to discounted methodology eliminated a tax benefit attributable to the time value of money. It also required taxpayers to change their accounting methods. To facilitate a smooth transition to the new

rules, Congress included two relief provisions in the legislation--the "transition rule" and the "fresh start".

A.  The Change From Undiscounted to Discounted Reserve Accounting

Section 832(c)(4) permits P&C insurers to deduct "losses incurred", as defined in section 832(b)(5), in each taxable year. Under section 832(b)(5), losses incurred are defined as the excess of (1) the sum of (a) losses paid during the current tax year and (b) yearend reserves in the current tax year over (2) yearend reserves in the preceding tax year. Prior to 1986, section 832 provided P&C insurers with a significant tax benefit. It permitted them to take current deductions for future payments without requiring them to make any adjustments for the time value of money. To eliminate this benefit, TRA '86 added section 846. Section 846 requires reserves for taxable years beginning after December 31, 1986, to be discounted and thus reduces the losses incurred deduction (as calculated under section 832(b)(5)) to reflect the time value of money.

Without a relief provision, section 846 would have required P&C insurers to compare undiscounted 1986 reserves with discounted 1987 reserves for purposes of computing their losses incurred deductions for 1987. Such an "apples-to-oranges" comparison would have significantly reduced the losses incurred deduction for the 1987 tax year. To illustrate, assume a P&C insurer had loss reserves of $100 million at the end of 1986 and

$125 million at the end of 1987.  But for section 846, the losses incurred deduction attributable to unpaid losses would have been $25 million (i.e., $125 million - $100 million).  If pursuant to section 846 the $125 million of reserves at the end of 1987 were discounted to $110 million, the P&C insurer's losses incurred deduction would have been reduced from $25 million to $10 million (i.e., $110 million - $100 million).

To address this problem, Congress included a transition rule in TRA '86.  The transition rule provided that, for purposes of computing the losses incurred deduction at yearend 1987, 1986 reserves also would be discounted.  TRA '86 sec. 1023(e)(2), 100 Stat. 2404.  As a result of this transition rule, discounted 1987 reserves were compared with discounted 1986 reserves in computing the losses incurred deduction for the 1987 taxable year.

B.  The Application of Section 481

Even with the transition rule described above, P&C insurance companies remained subject to adverse tax consequences due to the application of section 481.  When a taxpayer changes its method of accounting, section 481 generally requires that the taxpayer make adjustments to prevent amounts from being duplicated in or omitted from its taxable income.  Compliance with the requirement that P&C insurers change the basis for computing their losses incurred deductions from an undiscounted to a discounted methodology constituted a change in accounting method.  Thus, section 481 would have required P&C insurers to recognize as

income the difference between (1) the undiscounted amount of loss reserves, as of yearend 1986, included in the computation of the losses incurred deduction for 1986 and (2) the discounted amount of such loss reserves.

To avoid triggering section 481 adjustments, Congress provided P&C insurers with a "fresh start" pursuant to section 1023(e)(3) of TRA '86.  TRA '86 sec. 1023(e)(3)(A), 100 Stat. 2404.  This section provides as follows:

(3) Fresh start.--

(A)  In general.--Except as otherwise provided in this paragraph, any difference between--

(i) the amount determined to be the unpaid losses and expenses unpaid for the year preceding the 1st taxable year of an insurance company beginning after December 31, 1986, determined without regard to paragraph (2) [i.e., without discounting], and

(ii) such amount determined with regard to paragraph (2) [i.e., with discounting],

shall not be taken into account for purposes of the Internal Revenue Code of 1986.

In essence, the fresh start provision overrode section 481 by excluding from taxable income the difference between the amount of the yearend 1986 undiscounted loss reserves and the discounted amount of such reserves.  In its report, the Committee of Conference (conference committee) described the effect of the fresh start provision as a "forgiveness of income".  H. Conf. Rept. 99-841 (Vol. II), at II-367 (1986), 1986-3 C.B. (Vol. 4) 1, 367.

The fresh start provision, however, created the potential for abuse. Because the difference between the undiscounted and discounted loss reserves as of yearend 1986 is excluded from taxation, P&C insurers could manipulate the fresh start provision by inflating their reserves. To prevent this abuse, Congress excluded "reserve strengthening" from the fresh start.

TRA '86, however, did not define "reserve strengthening". Generally, a P&C insurer's loss reserves may increase due to either of two factors: (1) Additions required to fund existing and increasing obligations under policies in force, or (2) additions required when a method or assumption used in calculating reserves is changed to produce higher reserves. As discussed in more detail below, respondent argues that "reserve strengthening" encompasses both types of additions, while petitioner contends that the term refers solely to additions resulting from changes in reserving methods or assumptions.

## II. The Statute, Legislative History, and Regulations

The House of Representatives initiated the provision requiring P&C insurers to discount their loss reserves. H.R. 3838, 99th Cong., 1st Sess. secs. 1021-1027 (1985). The Senate amended the House's proposal to include both (1) the fresh start provision and (2) the exclusion of "reserve strengthening" from the fresh start. See S. Rept. 99-313, at 510 (1986), 1986-3 C.B. (Vol. 3) 1, 510. Ultimately, the conference committee substantially revised the "reserve strengthening" language

contained in both the Senate bill and in the accompanying Senate Finance Committee report.

The Senate bill contained the following provision:

> (B) Reserve Strengthening After March 1, 1986.--
> * * * [the fresh start provision] shall not apply to
> any reserve strengthening reported for Federal income
> tax purposes after March 1, 1986, for a taxable year
> beginning before January 1, 1987, and such
> strengthening shall be treated as occurring in the
> taxpayer's 1st taxable year beginning after December
> 31, 1986.  The preceding sentence shall not apply to
> the computation of reserves on any contract if such
> computation employs the reserve practice used for
> purposes of the most recent annual statement filed on
> or before March 1, 1986, for the type of contract with
> respect to which such reserves are set up.  [H.R. 3838,
> 99th Cong., 2d Sess., sec. 1022(e)(3)(B), as reported
> by the Senate Finance Committee on May 29, 1986.]

The Finance Committee report stated that "reserve strengthening" consisted of "any adjustments to reserves that are attributable to changes in reserves on account of changes in the basis for computing reserves (i.e., reserve strengthening or reserve weakening) in a taxable year beginning before January 1, 1987".  S. Rept. 99-313, supra at 510, 1986-3 C.B. (Vol. 3) at 510.

The differences between the House and Senate versions of H.R. 3838 were reconciled by the conference committee.  The final bill adopted by the conference committee and enacted into law did not define "reserve strengthening".  It provided as follows:

> (B) Reserve Strengthening In Years After 1985.--
> * * * [the fresh start provision] shall not apply to
> any reserve strengthening in a taxable year beginning
> in 1986, and such strengthening shall be treated as
> occurring in the taxpayer's 1st taxable year beginning

after December 31, 1986.  [H. Conf. Rept. 99-841 (Vol. I), at I-338 (1986), 1986-3 C.B. (Vol. 1) 1, 321.]

The conference committee report accompanying the final bill, however, did provide a definition of "reserve strengthening" and, in fact, provided a more expansive definition of the term than that contained in the Finance Committee report.  The conference committee report stated:

> Reserve strengthening is considered to include all additions to reserves attributable to an increase in an estimate of a reserve established for a prior accident year (taking into account claims paid with respect to that accident year), and all additions to reserves resulting from a change in the assumptions (other than changes in assumed interest rates applicable to reserves for the 1986 accident year) used in estimating losses for the 1986 accident year, as well as all unspecified or unallocated additions to loss reserves. This provision is intended to prevent taxpayers from artificially increasing the amount of income that is forgiven under the fresh start provision.  [H. Conf. Rept. 99-841 (Vol. II), supra at II-367, 1986-3 C.B. (Vol. 4) at 367.]

In 1992, the U.S. Treasury Department issued regulations under section 846 that are based upon the definition of "reserve strengthening" contained in the conference committee report. Section 1.846-3(c), Income Tax Regs., provides in relevant part:

> (c) Rules for determining the amount of reserve strengthening (weakening).--(1) In general.  The amount of reserve strengthening (weakening) is the amount that is determined under paragraph (c)(2) or (3) to have been added to (subtracted from) an unpaid loss reserve in a taxable year beginning in 1986.  For purposes of * * * [the fresh start], the amount of reserve strengthening (weakening) must be determined separately for each unpaid loss reserve by applying the rules of this paragraph (c).  This determination is made without regard to the reasonableness of the amount of the unpaid loss reserve and without regard to the

taxpayer's discretion, or lack thereof, in establishing the amount of the unpaid loss reserve. The amount of reserve strengthening for an unpaid loss reserve may not exceed the amount of the reserve, including any undiscounted strengthening amount, as of the end of the last taxable year beginning before January 1, 1987. For purposes of this section, an "unpaid loss reserve" is the aggregate of the unpaid loss estimates for losses (whether or not reported) incurred in an accident year of a line of business.

    \*        \*        \*        \*        \*        \*        \*

(3) Accident years before 1986. (i) In general. For each taxable year beginning in 1986, the amount of reserve strengthening (weakening) for an unpaid loss reserve for an accident year before 1986 is the amount by which the reserve at the end of the taxable year exceeds (is less than)--

(A) The reserve at the end of the immediately preceding taxable year; reduced by

(B) Claims paid and loss adjustment expenses paid ("loss payments") in the taxable year beginning in 1986 with respect to losses that are attributable to the reserve. \* \* \*

III.   <u>The Western National Decision</u>

In <u>Western Natl. Mut. Ins. Co. v. Commissioner</u>, 102 T.C. 338 (1994), a Court-reviewed decision, this Court considered facts virtually identical to those presented in this case. The Court ruled for the taxpayer, holding that section 1.846-3(c), Income Tax Regs., is invalid to the extent that it treats all net additions in 1986, to pre-1986 loss reserves, as "reserve strengthening". As in the present case, the taxpayer in <u>Western National</u> had a higher loss reserve balance, for pre-1986 years,

at yearend 1986 than at yearend 1985, but had not changed its reserve assumptions or methodology in computing that balance. The Commissioner argued that all increases in reserves constituted "reserve strengthening" and that the taxpayer's increase therefore should have been excluded from the fresh start. In rejecting the Commissioner's position, the Court cited the following six factors:

> (1) The statute is not ambiguous and uses a term of art in a portion of the Internal Revenue Code which has been specially designed for a particular industry and generally contains industry jargon; (2) the legislative history materials are internally contradictory in that there are references to all increases to reserves and explanations regarding artificial increases or a specific type of increase; (3) the regulatory definition of the term "reserve strengthening" does not comport with insurance industry usage; (4) the regulatory definition of the term "reserve strengthening" does not harmonize with its congressional use 2 years earlier in related and parallel statutes involving life, rather than PC, insurance companies; (5) the regulatory approach would result in anomalous results; and (6) the traditional industry definition of the term comports with the concept that Congress was attempting to limit any attempts by taxpayers to take advantage of the fresh-start provisions by means of artificial increases to reserves. * * * [Id. at 360-361.]

The Court placed particular emphasis on several of these factors. It stated that subchapter L, which sets forth rules governing the taxation of insurance companies, "is a highly specialized portion of the Internal Revenue Code which is replete with the unique nomenclature of the insurance industry." Id. at 342-343. The Court acknowledged that the statute did not provide a definition of "reserve strengthening" but found that the term

refers to "a change in the formula or mechanism for calculating a reserve".  Id. at 352.  Moreover, the Court noted, Congress had defined the term as including only changes in assumptions or methodology when it enacted certain life insurance rules and a fresh start provision in the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 216(b), 98 Stat. 494, 758.  Id. at 353.  In rejecting the Commissioner's argument that "reserve strengthening" has a different meaning in the P&C insurance industry than in the life insurance industry, the Court concluded that "Congress could not have expected a different quantitative or qualitative meaning for the term" depending on the type of insurer.  Id. at 354.

Although section 1.846-3(c), Income Tax Regs., provided a definition of "reserve strengthening" consistent with the conference committee report, the Court in essence concluded that priority must be accorded to the statute, which "contains a term of art used in an unconditional manner."  Id. at 355.  Moreover, the Court noted, the conference committee report states that the fresh start was "intended to prevent taxpayers from artificially increasing the amount of income that is forgiven".  Id. at 356 n.19 (quoting H. Conf. Rept. 99-841 (Vol. II), supra at II-367, 1986-3 C.B. (Vol. 4) at 367).  The Court concluded that the word "artificially" refers to changes in assumptions or methodology. Id.  By contrast, the taxpayer in Western National merely had

made routine adjustments to its loss reserves based on its past reserving practices. Id. at 357.

The Court of Appeals for the Eighth Circuit affirmed the Tax Court's decision in Western National. It concluded that the term "reserve strengthening" when used in the life insurance industry refers to reserve increases attributable to changes in computational methods or assumptions. Western Natl. Mut. Ins. Co. v. Commissioner, 65 F.3d 90, 92-93 (8th Cir. 1995). The court rejected the Commissioner's argument that the term's meaning in the P&C insurance industry is ambiguous. Id. at 93. Having decided that the meaning of "reserve strengthening" is clear in the industry, the court further concluded that the legislative history underlying the provision is not controlling. Id. Nevertheless, the court stated that it had reviewed the legislative history "out of an abundance of caution" and found "'no persuasive rationale for interpreting the statutory term "reserve strengthening" in a manner different from industry usage.'" Id. (quoting Western Natl. Mut. Ins. Co. v. Commissioner, 102 T.C. at 355).

IV. Respondent's Position

Respondent urges this Court to reconsider its holding in Western National. Respondent in the present case, as in Western National, maintains that "reserve strengthening" encompasses all net additions in 1986 to pre-1986 loss reserves. Respondent acknowledges that, in the life insurance industry, the term

"reserve strengthening" has the meaning petitioner ascribes to it. Respondent continues to contend, however, that the term's meaning in the P&C insurance industry is ambiguous.

Respondent has presented expert testimony which indicates that the term is subject to more than one interpretation. One expert opined that the regulation's definition provided a valid measurement of "reserve strengthening". Another expert opined that the regulation's definition, while not technically accurate, was consistent with a common usage of the term in nonactuarial reporting. Moreover, respondent notes that the conference committee report's definition of "reserve strengthening" is fully consistent with her position. The report stated:

> Reserve strengthening is considered to include all additions to reserves attributable to an increase in an estimate of a reserve established for a prior accident year * * * and all additions to reserves resulting from a change in the assumptions * * * as well as all unspecified or unallocated additions to loss reserves. * * * [H. Conf. Rept. 99-841 (Vol. II), supra at II-367, 1986-3 C.B. (Vol. 4) at 367; emphasis added.]

Respondent also addresses two points made in Western National regarding the legislative history of "reserve strengthening". First, respondent argues that the Court's view--that the conference committee report "conflicts" with other portions of the legislative history--does not take into account the evolution of the statute. Conference committees reconcile differences between House and Senate versions of legislation and write the final legislation that is enacted into law. In

respondent's view, therefore, the decision of the conference committee to reject the language contained in the Senate report does not create a "conflict" but instead provides the rationale for the final legislation.

Second, respondent addresses the Court's concern that the conference committee's definition of "reserve strengthening" is internally contradictory. The Court found that the conference committee's definition of the term is "broader than necessary to accomplish the stated purpose of preventing abuse from artificial increases". Western Natl. Mut. Ins. Co. v. Commissioner, 102 T.C. at 350. Respondent contends that this point does not undermine her position, because Congress sometimes finds it expedient to adopt bright-line rules that do not in every case effectuate congressional intent precisely.

Because respondent believes that the statute is ambiguous and the regulations in issue effectively implement the conference committee's definition of "reserve strengthening", she maintains that the regulations reflect a reasonable and permissible construction of the statute.

Respondent argues in the alternative that, if we hold that "reserve strengthening" includes only those increases in reserves attributable to changes in methodology or assumptions, we should determine a lesser deficiency, because all or some of petitioner's additions to its IBNR and LAE reserves resulted from management's discretionary adjustments.

## V. Petitioner's Position

Consistent with this Court's holding in Western National, petitioner maintains that the term "reserve strengthening" is an insurance industry term of art with a clearly understood technical meaning. As used in the insurance industry, petitioner argues, "reserve strengthening" encompasses only those increases in loss reserves that are attributable to nonperiodic, significant changes in the assumptions and/or methodologies used to establish such loss reserves. Because the increase in petitioner's 1986 reserves for pre-1986 accident years occurred without a change in methodology, petitioner contends that the increase does not constitute "reserve strengthening".

Petitioner further argues that there is no need to consider the legislative history to interpret the term "reserve strengthening", because the term is unambiguous. Accordingly, petitioner argues that the regulatory definition of "reserve strengthening" is invalid to the extent that it treats all net additions in 1986, to pre-1986 loss reserves, as "reserve strengthening".

## VI. Analysis and Conclusion

Despite respondent's cogent arguments to the contrary, we hold that petitioner's reserve increases do not constitute "reserve strengthening". The facts of Western National are indistinguishable from the present case. Therefore, the doctrine of stare decisis leads us to the same result. In each case, the

taxpayer's reserves, for pre-1986 years, at yearend 1986 exceeded its reserves at yearend 1985, and that excess reflected routine adjustments made consistent with past reserving practices. In each case, the taxpayer did not change its reserving assumptions or methodology.

Respondent attempts to distinguish the present case from Western National based on the submission of expert testimony. In Western National, respondent chose not to submit expert testimony and instead contended that congressional intent, as expressed in the conference committee report, was determinative. Having lost on that argument, respondent has submitted expert testimony in the present case in her attempt to establish that the term "reserve strengthening" is subject to more than one interpretation.

The Court's decision in Western National, however, was not based solely on expert testimony. In fact, the Court in Western National acknowledged that the expert testimony submitted in that case "did not establish a universal and precise definition of reserve strengthening" but concluded that the testimony did provide "sufficient guidance to enable our recognition of the conceptual elements involved in industry jargon." Western Natl. Mut. Ins. Co. v. Commissioner, 102 T.C. at 351 n.10. Moreover, several of the factors cited by the Court for its decision in Western National did not depend on expert testimony. For example, the Court stated that: (1) Congress previously had used

the term "reserve strengthening" in a life insurance industry statute in a manner consistent with the taxpayer's interpretation; (2) respondent's regulation created anomalous results; and (3) the taxpayer's interpretation of the term comported with Congress' objective of preventing willful abuse of the fresh start provision.

Respondent argues in the alternative that we should determine a lesser deficiency, because all or some of petitioner's additions to its IBNR and LAE reserves resulted from management's discretionary adjustments. We disagree. In both Western National and the present case, case reserves formed the majority of petitioner's loss reserves and were not adjusted by management. Moreover, in both cases senior management retained some discretion to adjust the reserve amounts arrived at through formulaic computations, and both taxpayers maintained that the adjustments were made pursuant to actuarial data to ensure the adequacy of reserves. There were no increases to the reserves for the period in question attributable to changes in underlying assumptions or methodology.

To reflect the foregoing,

Decision will be entered

for petitioners.