

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-24-1997

# Atl Mutl Ins Co v. Commissioner IRS

Precedential or Non-Precedential:

Docket 96-7424

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Atl Mutl Ins Co v. Commissioner IRS" (1997). *1997 Decisions.* Paper 89.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/89

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 96-7424
_____


ATLANTIC MUTUAL INSURANCE COMPANY, and
Includible Subsidiaries

vs.

COMMISSIONER OF INTERNAL REVENUE

                                Appellant

_____


Appeal from the United States Tax Court
(Tax Court No. 93-25767)

_____


Argued
March 13, 1997
Before:  MANSMANN and LEWIS, Circuit Judges,
        and MICHEL, Circuit Judge.*

(Filed April 24, 1997)

_____


John S. Breckinridge, Jr., Esquire (ARGUED)
James H. Kenworthy, Esquire
LeBoeuf, Lamb, Greene & MacRae
125 West 55th Street
New York, NY  10019

Frederick B. Lacey, Esquire
LeBeouf, Lamb, Greene & MacRae
One Riverfront Plaza
Newark, NJ  07102

   COUNSEL FOR APPELLEE



*        Honorable Paul R. Michel of the United States Court of
Appeals for the Federal Circuit, sitting by designation.

Gary R. Allen, Esquire
David I. Pincus, Esquire
Edward T. Perelmuter, Esquire (ARGUED)
Loretta C. Argrett
  Assistant Attorney General
United States Department of Justice
Tax Division
P.O. Box 502
Washington, D.C.  20044

   COUNSEL FOR APPELLANT

——————————

OPINION OF THE COURT

——————————

MANSMANN, Circuit Judge.

   In this appeal, we address the "fresh start" provision of section 1023(e)(3) of the Tax Reform Act of 1986.  There Congress permitted property & casualty insurers a one-time forgiveness of income resulting from the change in computing "losses incurred deductions" from undiscounted to a discounted basis as mandated by newly enacted section 846 of the Internal Revenue Code.  Specifically, the Commissioner challenges the decision of the Tax Court which invalidated Treas. Reg. § 1.846-3(c) to the extent that it defines all additions to a property & casualty insurer's loss reserves as "reserve strengthening."

   We find that the meaning of the term "reserve strengthening" in section 1023(e)(3)(B) of the Tax Reform Act of 1986 is ambiguous.  We thus turn to the legislative history to determine Congress' intent.  Utilizing the deference principles of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), we conclude that Treas. Reg. § 1.846-3(c) is based on a permissible construction of the Act and

2

implements the intent of Congress in some reasonable manner.

Accordingly, we will reverse the decision of the Tax Court.

I.

The statutory provision at issue is section 1023 of Pub. L. No. 99-514, 100 Stat. 2085, 2399, of the Tax Reform Act of 1986 (TRA 1986), which added new section 846 of the Internal Revenue Code. In enacting section 846, Congress included two relief provisions--the "transition rule" and the "fresh start"-- to facilitate a smooth transition to the new rules. Atlantic Mutual Insurance Co. v. Commissioner, 71 T.C.M. (CCH) 2154, 2156 (1996). The transition rule, set forth in section 1023(e)(2) of TRA 1986, provided that for purposes of computing the losses incurred deduction for 1987, the year-end 1986 reserves would be discounted.[1] Absent this relief provision, section 846 would

_____

1. Property & casualty companies are taxed pursuant to I.R.C. §§ 831 through 835. Under section 832(a), the taxable income of such a company is defined as the gross income minus allowable deductions. Section 832(c)(4) provides that these deductions include "losses incurred" as defined in section 832(b)(5). Prior to 1986, section 832(b)(5) defined "losses incurred" for all relevant purposes as the amount of "losses paid" during the year plus the increase (or minus the decrease) in "unpaid losses." In practice, the P&C company would deduct the full amount of the estimated total loss in the year of the loss-event, even though the claim might not be paid for several years. When the claim was paid, the company would not receive any additional deduction (assuming that the payment equalled the original estimate) because the payment would be offset by a corresponding reduction it its unpaid-loss reserve.

Prior to TRA 1986, property & casualty insurers received an unsolicited benefit because the tax laws failed to take into consideration the time value of money in calculating the deduction for losses incurred. Congress addressed this problem by enacting I.R.C. § 846 as part of TRA 1986, which provides for the discounting of unpaid losses. The new discounting rules apply to all taxable years commencing after

3

have required property & casualty ("P&C") insurers to compare undiscounted 1986 reserves with discounted 1987 reserves for purposes of computing their losses incurred deductions for 1987. As the Tax Court explained, "Such an `apples-to-oranges' comparison would have significantly reduced the losses incurred deduction for the 1987 tax year."  Id.

Notwithstanding the relief provided by the transition rule, P&C insurers were still obligated to include in their 1987 taxable income the excess of the undiscounted year-end 1986 loss reserves over the discounted year-end 1986 loss reserves, due to the application of I.R.C. § 481.[2]  To avoid the application of section 481, Congress allowed P&C insurers a one-time "forgiveness" of income under the "fresh start" provision of

section 1023(e)(3) of TRA 1986.  That section provides:
(3) Fresh Start.--
      (A) In General.--Except as otherwise provided
      in this paragraph, any difference between--
         (i) the amount determined to be the
           unpaid losses and expenses unpaid
           for the year preceding the 1st
           taxable year of an insurance
           company beginning after December
           31, 1986, determined without regard
           to paragraph (2), [i.e., without
           discounting] and
         (ii) such amount determined with
           regard to paragraph (2) [i.e., with
           discounting],
(..continued)
December 31, 1986.  Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085, 2404.

2.        Normally, section 481 would require a taxpayer to recognize the excess as income, because the change in the basis for computing losses incurred deductions from an undiscounted to a discounted methodology constitutes a change in accounting method.  In this circumstance, I.R.C. § 481 requires the taxpayer to make an appropriate adjustment to prevent it from obtaining a double deduction created by the change in accounting method.

4

shall not be taken into account for purposes of the
          Internal Revenue Code of 1986.

In substance, the fresh start rule overrides section 481 by excluding from taxable income the difference between the amount of the year-end 1986 undiscounted loss reserves and the discounted amount of such reserves.

Congress anticipated, however, the potential for abuse created by the fresh start provision -- that insurers could manipulate the fresh start provision by inflating their reserves. To prevent such abuse, Congress enacted section 1023(e)(3)(B) to exclude any increases in loss reserves due to "reserve strengthening."  Section 1023(e)(3)(B) provides:

          (B) RESERVE STRENGTHENING IN YEARS AFTER
          1985.--Subparagraph (A) shall not apply to
          any reserve strengthening in a taxable year
          beginning in 1986, and such strengthening
          shall be treated as occurring in the
          taxpayer's 1st taxable year beginning after
          December 31, 1986.

The meaning of the term "reserve strengthening," as used in section 1023(e)(3)(B), lies at the heart of the controversy before us.  We turn now to the particular facts of this case.


                              II.

The parties fully stipulated to the following facts before the United States Tax Court.    Atlantic Mutual Insurance Co. (Atlantic) is the common parent of an affiliated group of corporations whose principal place of business is located in Madison, New Jersey.  Organized in 1842 under the laws of the State of New York as a mutual marine insurer, Atlantic eventually

5

expanded its insurance underwriting activities to include property & casualty insurance. Centennial Insurance Company, a wholly owned subsidiary of Atlantic, is a P&C insurance company included in Atlantic's consolidated income tax return. The Commissioner's notice of deficiency relates to the activities of both Atlantic and Centennial (collectively the "taxpayer").

From 1985 through 1993, the taxpayer filed annual financial statements with the appropriate state insurance departments.[3] P&C insurers are required to report estimates of amounts they expect to pay for losses that have already occurred on the annual statement. These estimates are commonly referred to as "loss reserves" (or simply "reserves").

For the years in issue, case reserves constituted the majority of the taxpayer's loss reserves.[4] The taxpayer set up its case reserves by assigning a claims adjuster to examine each reported claim and to estimate the amount, if any, that would be paid to resolve it. For all years at issue, the taxpayer's case

3.       Each annual statement was prepared in the format prescribed by the National Association of Insurance Commissioners (NAIC) in order to provide state insurance commissioners with information concerning a P&C insurer's financial condition. The accounting principles on which the NAIC-prescribed annual statement is based generally have been incorporated into the Internal Revenue Code sections applicable to P&C insurers.

4.       In its P&C insurance business, the taxpayer maintained three categories of loss reserves: (1) case reserves, which reflect estimates of amounts to be paid to resolve claims that have been reported to the taxpayer; (2) incurred but not yet reported (IBNR) reserves, which consists of estimates of amounts to be paid to resolve claims statistically presumed to have been incurred but not yet reported to the taxpayer; and (3) loss adjustment expense (LAE) reserves, which reflect estimates of administrative costs to be paid in settling or otherwise resolving claims.

6

reserves totalled $255,655,141 at year-end 1985 and $277,705,661 at year-end 1986.

The Commissioner tested for "reserve strengthening" by applying the formula set forth in Treas. Reg. § 1.846-3(c)(3) to each of the taxpayer's lines of P&C insurance for pre-1986 accident years. Under the formula, the taxpayer's reserves at year-end 1985 were reduced by the claims and the loss adjustment expense (LAE) paid in 1986 with respect to those reserves. To the extent that, at year-end 1986, a reserve was greater than the amount determined under the formula, the excess was treated as a net increase to that reserve account (i.e., "reserve strengthening"). Where, at year-end 1986, a reserve was less than the amount determined under the formula, the difference was treated as a net decrease to that reserve account (i.e., "reserve weakening").

The Commissioner determined that, at year-end 1986, the taxpayer's net "reserve strengthening" totalled $6,552,739. Pursuant to I.R.C. § 846, the Commissioner then discounted the $6,552,739, resulting in an understatement of the taxpayer's 1987 income of $1,339,039. The Commissioner further determined that this understatement caused a deficiency of $519,987 in the taxpayer's 1987 income tax liability and, accordingly, issued a Notice of Deficiency on September 23, 1993. In response, the taxpayer petitioned the Tax Court for a redetermination of the deficiency.

After considering all of the evidence, the Tax Court, on February 22, 1996, issued its decision concluding that the

7

taxpayer was not liable for the asserted deficiency. In reaching this conclusion, the Tax Court held the taxpayer's reserve increases did not constitute "reserve strengthening." Atlantic Mutual, 71 T.C.M. at 2159. The Tax Court found that the doctrine of stare decisis obligated it to reach the same result as that obtained in Western National Mutual Ins. Co. v. Commissioner, 102 T.C. 338 (1994), aff'd 65 F.3d 90 (8th Cir. 1995), which the court found to be factually indistinguishable from this case. The Commissioner filed this timely appeal.

We have jurisdiction pursuant to 26 U.S.C. § 7482(a) and we exercise plenary review over a legal challenge to the validity of a treasury regulation. Tate & Lyle, Inc. v. Commissioner, 87 F.3d 99, 102 (3d Cir. 1996) (citing Mazzochi Bus Co., Inc. v. Commissioner, 14 F.3d 923, 927 (3d Cir. 1994)).


III.

Initially, we must determine whether the meaning of "reserve strengthening" is clear from the plain language of section 1023(e)(3)(B). Our review of an agency's interpretation of a statute that it is empowered to administer is guided by the well-established principles of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984); see also, Appalachian States Low-Level Radioactive Waste Commission v. O'Leary, 93 F.3d 103, 108 (3d Cir. 1996). The two-step inquiry in Chevron requires us to first determine "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. If the intent of Congress is clear from the plain language

8

of the statute, then our inquiry ends there.  If we conclude, however, that Congress is silent or the statute is ambiguous regarding the issue, then the second step of our inquiry is to determine whether the agency's interpretation is based on a permissible construction of the statute.  Id. at 843.

Addressing the first prong of Chevron, we turn to the plain language of section 1023(e)(3)(B).  Clearly absent from the text of the statute is any explanation of the meaning of the term "reserve strengthening."  We must determine, therefore, whether Congress intended the meaning of reserve strengthening, as used in the life insurance industry, to apply to P&C insurers.  The Tax Court, bound by its previous decision in Western National which concluded that reserve strengthening as employed in section 1023(e)(3)(B) is a term of art adopted from the life insurance industry, rejected the Commissioner's argument that the meaning of "reserve strengthening" in the P&C insurance industry is ambiguous.  We note the distinction, however, that the Commissioner did not present expert witnesses in Western National.

The expert testimony here makes clear that the term "reserve strengthening" as used in section 1023(e)(3)(B) is subject to more than one interpretation.[5]  Indeed, the Tax Court

5. The Commissioner and the taxpayer introduced expert reports in the Tax Court proceedings concerning the meaning of "reserve strengthening" within the P&C industry.  The taxpayer's first expert, Irene R. Bass, construed "reserve strengthening" as involving "a one-time (or, at least, unusual and non-periodic), significant change in the assumptions and/or methodologies used to compute the reserves which results in a material change to the relative level of adequacy of the total reserve inventory."  Bass conceded, however, that "[w]ithin the context of the reserve

9

(..continued)
setting process, the term reserve strengthening is not a well-defined PC insurance or actuarial term of art to be found in PC actuarial, accounting, or insurance regulatory literature." She then opined that "the lack of a well recognized definition of reserve strengthening in PC insurance literature can be attributed to the recursive nature of the reserve setting process and the fact that identification of reserve strengthening is not a requirement of the normal process of setting reserves."

The taxpayer's second expert, W. James MacGinnitie, concurred with the expert opinion of Irene Bass. MacGinnitie then described the concept of reserve strengthening in terms of the adequacy of reserves to satisfy future claims, equating adequacy to reserve strengthening and inadequacy to reserve weakening. He further opined that this determination was one that could not be definitively made until all claims covered by the reserves in question had been finally settled. According to MacGinnitie, in order to determine whether reserve strengthening has occurred one must compare the adequacy of the current reserve for a line of business to the adequacy of a previous reserve for that same line of business.

The Commissioner submitted expert reports prepared by Raymond S. Nichols and Ruth Salzmann. In his report, Nichols stated: "In the property-casualty industry the term `reserve strengthening' has various meanings, rather than a single universal meaning. However, in determining a property-casualty insurer's underwriting income, `reserve strengthening' generally refers to a positive amount resulting from the difference between calendar year incurred losses and accident year incurred losses." Nichols opined that "[a]ny definition of `reserve strengthening' that restricts the words to the idiosyncrasies of individual company reserve assumptions and methods will miss the impact of reserve strengthening during underwriting cycles. For this reason alone, the common definition of `reserve strengthening' does not restrict the meaning to changes in reserve assumptions and methods."

Finally, the Commissioner's second expert, Ruth Salzmann, proffered her definition of reserve strengthening: "Reserve strengthening (or reserve weakening) is a term used in connection with P/C income statements. It refers to the dollar change in the margin of adequacy in the beginning and ending reserves for unpaid losses for that accounting period. The change can be for whatever reason and for any amount. If ending reserves are more adequate (or less inadequate) than the beginning reserves, there is reserve strengthening in the accounting period and net income is understated; conversely, if ending reserves are less adequate (or more inadequate), there is reserve weakening and net income for the accounting period is overstated."

10

in Western National commented that the opinions and testimony of the numerous expert witnesses failed to establish a "universal and precise definition of reserve strengthening." 102 T.C. at 351 n.10. The Tax Court nonetheless found that it was able to glean from the expert testimony the conceptual elements of reserve strengthening as they are commonly used in the insurance industry; it concluded that the concept of reserve strengthening has the same meaning in the context of the P&C and life insurance business. Id. at 351 n. 10 and 354. We part company with the Tax Court's holding in this regard.

In determining that "reserve strengthening" has the same meaning for both life and P&C insurers, the Tax Court in Western National focused on the fact that Congress, in drafting the language of Subchapter L of the Internal Revenue Code, recognized the unique and highly specialized nomenclature of the insurance industry. Moreover, the court observed that "[i]n enacting the fresh-start provision of the DEFRA [Deficit Reduction Act of 1984], Congress used an industry term of art in a manner consistent with its traditional definition[]" within the life insurance business.[6] 102 T.C. at 359. Accordingly, the Tax Court concluded that "reserve strengthening" was a term of art

_____

6. When Congress enacted the fresh start provision for certain life insurance rules in DEFRA, it specifically defined "reserve strengthening" to include only changes in assumptions and methodology. The Commissioner argued that "reserve strengthening" has a different meaning in the P&C insurance industry. In rejecting this argument, the Tax Court "concluded that `Congress could not have expected a different quantitative or qualitative meaning for the term' depending on the type of insurer." Atlantic Mutual, 71 T.C.M. at 2158 (quoting Western Nat'l, 102 T.C. at 354).

11

adopted from the insurance industry. Opining that the legislative history contained contradictory explanations and, in part, supported the Commissioner's regulatory position, the Tax Court nonetheless concluded that Congress intended "reserve strengthening" to be interpreted in a manner consistent with industry usage. Id. at 360.[7]

The Tax Court's reliance on cases, revenue rulings and legislation involving life insurance reserves is misplaced. For federal income tax purposes, life insurance companies and P&C insurers are taxed in entirely separate manners. Gross income as well as loss reserves are computed on different bases and assumptions. Actuarial assumptions about interest rates and mortality rates are an integral part of computing future losses which form the basis of the loss reserves in life insurance. On the other hand, P&C loss reserves are determined primarily based

---

7.        The Court of Appeals for the Eight Circuit affirmed the decision of the Tax Court, holding that Treas. Reg. § 1.846-3(c) was invalid to the extent that it defines "reserve strengthening" in a manner contrary to industry usage. Western National Mutual Ins. Co. v. Commissioner, 65 F.3d 90, 93 (8th Cir. 1995). In reaching this conclusion, the court of appeals opined that Congress intended to deny the fresh start deduction only to those property & casualty companies that computed their 1986 unpaid loss reserves on the basis of methodologies or assumptions that were different from those employed in calculating the same reserves in prior years. Id. at 93. As a corollary to this conclusion, the court of appeals also found that the term "reserve strengthening" was not ambiguous. Id. (footnote omitted). Accordingly, the court held that it was not required to consider the legislative history to divine the meaning of "reserve strengthening." Id. The court of appeals nonetheless proceeded to examine the legislative history, "out of an abundance of caution," and determined that it failed to provide persuasive rationale for interpreting "reserve strengthening" contrary to industry usage. Id. We respectfully disagree.

on past claims experience and the judgments of the individual claims adjusters.

In the life insurance industry, reserve strengthening constitutes an unusual increase resulting generally from a change in one of the fundamental reserve assumptions (i.e., interest rate, mortality rate, method), as contrasted to normal increases in life insurance reserves, which result from the receipt of additional premiums or accrued interest. We find it illogical to apply the life insurance definition of reserve strengthening to P&C insurers -- whose reserves are not predicated upon the same actuarial assumption. If we did so apply it, arguably there would never be any reserve strengthening in the P&C area since interest rates, mortality assumptions and methodologies are not underlying components of the P&C loss reserves. The Commissioner makes a persuasive argument that the differences between life insurance and P&C loss reserves "render the wholesale importation of life insurance concepts into the P&C unpaid-loss reserve area quite dubious at best."

The revenue rulings cited by the Tax Court and the taxpayer[8] are inapposite to the issue of reserve strengthening by P&C insurers. These revenue rulings address <u>life</u> insurance reserves maintained by P&C insurers who also write life insurance. In both rulings, the taxpayers requested advice on how to compute life insurance reserves in a given factual situation. The rulings do not define reserve strengthening with

_____

8.       Rev. Rul. 65-240, 1965-2 C.B. 236, Rev. Rul. 78-354, 1978-2 C.B. 190.

13

respect to P&C loss reserves in the context of life insurance reserves.

Moreover, we find that the reserve strengthening provision in DEFRA differs from the provision in TRA 1986 and, thus, supports the Commissioner's argument that Congress did not intend to import the life insurance definition of reserve strengthening into section 1023(e)(3)(B). The 1984 statute specifically links reserve strengthening by life insurance companies to changes in the reserve practice used on the most recent annual financial statement. A similar limitation was contained in the Senate amendment to section 1023(e)(3)(B) but was intentionally eliminated by the Conference Committee. The Supreme Court addressed a similar situation involving the RICO statute and held:

> [W]here Congress includes particular language in one section of a statute, but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion. Had Congress intended to restrict § 1963(a)(1) to an interest in an enterprise, it presumably would have done so expressly as it did in the immediately following subsection (a)(2). * * * The short answer is that Congress did not write the statute that way. We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship.

Russello v. United States, 464 U.S. 16, 23-24 (1983). Accordingly, the reserve strengthening provision of DEFRA does not support the taxpayer's position here.

14

Given the lack of an explicit statutory definition of reserve strengthening, the conflicting definitions of reserve strengthening provided by the expert witnesses, and our finding that the meaning attributed to reserve strengthening in the life insurance industry is not applicable to P&C insurers, we conclude that the meaning of "reserve strengthening" is ambiguous. Accordingly, we find the Tax Court erred as a matter of law in holding that the meaning of reserve strengthening in section 1023(e)(3)(B) was plain.

Because we find the meaning of the term "reserve strengthening" ambiguous with regard to P&C insurers, we turn to the second prong of the Chevron inquiry. In so doing, we are required to take a deferential approach to ascertaining whether the agency's interpretation is a permissible one. Appalachian States Low-Level Radioactive Waste Commission v. O'Leary, 93 F.3d at 110. Thus, "we must determine `whether the regulation harmonizes with the plain language of the statute, its origin, and purpose. So long as the regulation bears a fair relationship to the language of the statute, reflects the views of those who sought its enactment, and matches the purpose they articulated, it will merit deference.'" Id. (quoting Sekula v. F.D.I.C., 39 F.3d 448, 452 (3d Cir. 1994)).

We begin our analysis by turning to the legislative history of section 1023(e)(3)(B). The provision requiring P&C insurers to discount their loss reserves originated in a House bill. H.R. 3838, 99th Cong., 1st Sess., §§ 1021-1027 (1985). In the Senate version, the provision was amended to include the fresh start provision as well as the exclusion for reserve strengthening. The pertinent language of the Senate bill states:

(3)    FRESH START.--

(A)    IN GENERAL.--Except as otherwise provided in this paragraph, any difference between the amount determined to be the unpaid losses and expenses unpaid for the year preceding the first taxable year of an insurance company beginning after December 31, 1986, determined without regard to paragraph (2), and such amount determined with regard to paragraph (2), shall not be taken into account for purposes of the Internal Revenue code of 1954.

        (B)  RESERVE STRENGTHENING AFTER MARCH 1, 1986.
[The fresh start provision] shall not apply to any reserve
        strengthening reported for Federal income tax
        purposes after March 1, 1986, for a taxable year
        beginning before January 1, 1987, and such
        strengthening shall be treated as occurring in
        the taxpayer's 1st taxable year beginning after
        December 31, 1986.  The preceding sentence shall
        not apply to the computation of reserves on any
        contract if such computation employs the reserve
        practice used for purposes of the most recent
        annual statement filed on or before March 1,
        1986, for the type of contract with respect to
        which reserves are set up.

H.R. 3838, 99th Cong., 2d Sess., § 1022(e) (as reported by the

Senate Finance Committee, May 29, 1986) (emphasis added).  The

Senate Finance Committee explained this provision as follows:
Any reserve strengthening after March 1, 1986, is to be
        treated as reserve strengthening for the
        first taxable year beginning after December
        31, 1986.  The committee intends that any
        adjustments to reserves that are attributable
        to changes in reserves on account of changes
        in the basis for computing the reserves
        (i.e., reserve strengthening or reserve
        weakening) in a taxable year beginning before
        January 1, 1987, are not taken into account
        in determining taxable income after the
        effective date.

S. Rep. No. 99-313, 1986-3 C.B. (Vol. 3) 510.

        The Conference Committee reconciled the differences

between the House and Senate versions of H.R. 3838 by eliminating

the last sentence of the Senate amendment (section 1022(e)(3)(B))

that linked reserve strengthening to changes in reserve setting

practices.  Although the final bill did not define "reserve

strengthening," the Conference Committee report accompanying the

final bill did, in fact, provide a definition of that term.  The

Conference Committee's definition, which was more expansive than

17

that contained in the Senate Finance Committee report, reads as follows:

> Reserve strengthening is considered to include all additions to reserves attributable to an increase in an estimate of a reserve established for a prior accident year (taking into account claims paid with respect to that accident year), and all additions to reserves resulting from a change in the assumptions (other than changes in assumed interest rates applicable to reserves for the 1986 accident year) used in estimating losses for the 1986 accident year, as well as all unspecified or unallocated additions to loss reserves. This provision is intended to prevent taxpayers from artificially increasing the amount of income that is forgiven under the fresh start provision.

H.R. Conf. Rep. No. 99-841, 99th Cong., 2d Sess., at II-367 (1986), reprinted in 5 U.S.C.C.A.N. 4075, 4455 (1986).[9] Further evidence of the Conference Committee's expansion of the definition of reserve strengthening is found in Senator Wallop's criticism of the Committee's action:

> Presumably, the intent is to prevent insurers from artificially increasing the opening reserve in order to increase income forgiven under fresh start. Implicit in this provision is the notion that reserve strengthening actions taken by insurance companies during 1986 for prior accident years is heavily motivated by the desire to avoid Federal income taxes. Nothing could be further from the truth. While it certainly can be acknowledged that increases in reserves decrease an insurance company's Federal tax burden, there are substantial and legitimate nontax reasons[10] for increasing

---

9.     The Tax Court here acknowledged that the Conference Committee's definition of reserve strengthening was more expansive than that contained in the Finance Committee report. Atlantic Mutual, 71 T.C.M. at 2157.

10.     Senator Wallop offered two legitimate nontax reasons for increasing reserves: (1) reserves are based on estimates computed from statistical models that are subject to error and,

the provision for unpaid losses in prior accident years. . . .

. . .

The reserve strengthening definition as currently written in the conference report       is arbitrary and inconsistent with one of the goals of tax reform, that is, fostering positive behavioral response from corporate and individual taxpayers toward the Federal tax system.

The Senate bill's reserve strengthening provision was fair.  The Internal Revenue Service, as it does under current law, would combat abusive reserving practices.  The conference modification substitutes a simplistic, cookbook approach that is entirely inappropriate and will likely create tensions causing companies to underreserve to the potential detriment of their policyholders.

132 Cong. Rec. 32625 (daily ed. October 16, 1986).

Treas. Reg. § 1.846-3(c) (1992),[11]  which is predicated

on the definition of "reserve strengthening" set forth in the

Conference Committee report, provides in pertinent part:

> **(c) Rules for determining the amount of reserve strengthening (weakening)--(1) In general**.  The Amount of reserve strengthening (weakening) is the amount that is determined under paragraph (c)(2) or (3) to have been added to (subtracted from) an unpaid loss reserve in a taxable year beginning in 1986.  For purposes of [the fresh start], the amount of reserve strengthening (weakening) must be determined separately for each unpaid loss reserve by applying the rules of this

(..continued)
thus, must be reevaluated from time to time; and (2) P&C insurers have historically been underreserved and reserve strengthening for them occurs is a normal part of doing business.

11.      In 1988, the IRS issued a notice of forthcoming regulations regarding the application of section 1023(e)(3)(B). I.R.S. Notice 88-100, 1988-2 C.B. 439.  Proposed regulations were issued in 1991, Proposed Treas. Reg. § 1.846-3, 56 F.R. 20161 (May 2, 1991), and eventually, final regulations were promulgated on September 4, 1992.

19

paragraph (c). this determination is made without regard to the reasonableness of the amount of the unpaid loss reserve and without regard to the taxpayer's discretion, or lack thereof, in establishing the amount of the unpaid loss reserve. The amount of reserve strengthening for an unpaid loss reserve may not exceed the amount of the reserve, including any undiscounted strengthening amount, as of the end of the last taxable year beginning before January 1, 1987. For purposes of this section, an "unpaid loss reserve" is the aggregate of the unpaid loss estimate for losses (whether or not reported) incurred in an accident year of a line of business.

. . .

**(3) Accident years before 1986--(i) In general.** For each taxable year beginning in 1986, the amount of reserve strengthening (weakening) for an unpaid loss reserve for an accident year before 1986 is the amount by which the reserve at the end of that taxable year exceeds (is less than)--

(A) The reserve at the end of the immediately preceding taxable year; reduced by

(B) Claims paid and loss adjustment expenses paid ("loss payments") in the taxable year beginning in 1986 with respect to losses that are attributable to the reserve. . . .

In the explanation accompanying the final regulations, the IRS

noted its reason for not adopting the commentators' suggested

alternatives to the mechanical test:

Congress did not limit the imposition of the reserve strengthening rule to tax motivated transactions. The legislative history indicates that for purposes of the fresh start adjustment the term "reserve strengthening" includes "all additions to reserves attributable to an increase in an estimate of reserves established for a prior accident year (taking into account claims paid with respect to that accident year), and all additions to reserves resulting from a change in the assumptions (other than changes

in the assumed interest rates applicable to reserves for the 1986 accident year) used in estimating losses for the 1986 accident year, as well as all unspecified or unallocated additions to loss reserves".  See 2 H.R. Conf. Rep. 841, 99th Cong., 2d Sess. II-367 (1986), 1986-3 (Vol. 4) C.B. 367.  Thus, Congress adopted an expansive and mechanical definition of reserve strengthening that is reflected in the final regulations.

1992-2 C.B. 146, 148.

A close examination of Treas. Reg. § 1.846-3(c)(3) reveals that virtually all additions to reserves constitute reserve strengthening.  The regulation also contains two narrow exceptions, neither of which applies here.  The regulation can be reconciled with the Conference Committee's description of reserve strengthening which is all-inclusive:  "all additions to reserves attributable to an increase in an estimate of a reserve established for a prior accident year (taking into account claims paid with respect to that accident year). . . ."  H.R. Conf. Rep. No. 99-841.  As it applies to reserve strengthening for pre-1986 accident years, Treas. Reg. § 1.846-3(c) does not contradict the Conference explanation and is somewhat more generous to the taxpayer by providing two, albeit narrow, exceptions.

Our remaining inquiry is whether the regulation harmonizes with the articulated purpose of section 1023(e)(3)(B).  The purpose of the reserve strengthening exception, as articulated by the Conference Committee, is "to prevent taxpayers from artificially increasing the amount of income that is forgiven under the fresh start provision."  The Commissioner and the taxpayer disagree as to the meaning to be ascribed to the

21

Committee's use of the word "artificially" in delineating the purpose of the limitation. This dispute stems from the Tax Court's statement, in Western National, that the word "artificial" suggests a dichotomy between routine, normal additions to reserves and irregular or nonperiodic increases attributable to changes in actuarial assumptions or methodology. The Tax Court's analysis, however, cannot be reconciled with the Conference Committee's broad definition of reserve strengthening which includes normal additions. Thus, the Conference Committee used the term "artificial" in a general sense, to refer to any increases in the reserves other than those resulting from the difference attributed to the discounting of reserves. To accept the Tax Court's construction of "artificial" would mean that the Conference Committee intentionally contradicted itself one sentence later.

In light of the above discussion, we cannot say that Treas. Reg. § 1.846-3(c)(3) is inconsistent with Congress' intent, as evidenced by the Conference report. Accordingly, we find that Treas. Reg. § 1.846-3(c) meets the second prong of the Chevron test and, thus, constitutes a valid interpretation of section 1023(e)(3)(B).

The taxpayer makes several arguments[12] suggesting that the application of the Treasury regulation will cause anomalous

---

12. The taxpayer further contends that despite numerous comments during the promulgation process as to the proposed regulation's infirmities, the Commissioner went forward in adopting a mechanical test for determining the amount of reserve strengthening. In particular, the taxpayer takes issue with the test's reserve-by-reserve approach as opposed to a claim-by-claim calculation. The Conference Report, however, supports a reserve-

22

results.  These involve unrealistic assumptions about the size and number of claims.  We agree with the Commissioner that, to the extent the mechanical test is flawed, the taxpayer should seek relief from Congress and not the courts.  "Judges cannot override the specific policy judgments made by Congress in enacting the statutory provisions with which we are here concerned."  United States v. Sotelo, 436 U.S. 268, 279 (1978).  We must not focus on the Act's policy, but rather, on what Congress intended in enacting the statute.[13]  Id. at 280.

The Treasury Department considered proposed alternatives to Treas. Reg. § 1.846-3 but ultimately concluded that the interpretation was consistent with Congress' intent.  As the Supreme Court observed in United States v. Correll, 389 U.S. 299, 306-07 (1967):

> Alternatives to the Commissioner's . . . rule are of course available.  Improvements might be imagined.  But we do not sit as a committee of revision to perfect the administration of the tax laws.  Congress has delegated to the Commissioner, not to the courts, the task of prescribing "all needful rules and regulations for the enforcement" of the

(..continued)
by-reserve approach ("all additions to reserves attributable to an increase in an estimate of a reserve established for a prior accident year.")(emphasis added).

13.      We agree with the Commissioner that the regulation need not provide the "perfect solution in every case to be valid." Indeed, in Mourning v. Family Publications Services, Inc., 411 U.S. 356, 371 (1973), the Court held the fact that another remedial provision might be preferred irrelevant to determining whether the agency overstepped its authority.  The Court stated:  "We have consistently held that where reasonable minds may differ as to which of several remedial measures should be chosen, courts should defer to the informed experience and judgment of the agency to whom Congress delegated appropriate authority." Id. at 371-72 (citations omitted).

23

Internal Revenue Code.  In this area of
limitless factual variations, "it is the
province of Congress and the Commissioner,
not the courts, to make the appropriate
adjustments."  The role of the judiciary in
cases of this sort begins and ends with
assuring that the Commissioner's regulations
fall within his authority to implement the
congressional mandate in some reasonable
manner.

(footnote and citation omitted).  Because Treas. Reg. § 1.846–
3(c) implements the intent of Congress in some reasonable manner,
the Tax Court erred in holding that the regulation was invalid.


V.

For the reasons set forth above, we will reverse the
decision of the Tax Court.

_____


TO THE CLERK:

Please file the foregoing opinion.


_____
Circuit Judge